Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

JOSH LUBERISSE, derivatively on behalf of EMBARK TECHNOLOGY, INC. f/k/a NORTHERN GENESIS ACQUISITION CORP. II,

Plaintiff,

v.

IAN ROBERTSON, KEN MANGET, ALEX RODRIGUES, RICHARD HAWWA, ELAINE CHAO, PAUL DALGLISH, PAT GRADY, CHRIS JARRATT, BRANDON MOAK, ROBERT SCHAEFER, AND BRAD SPARKES

Defendants,

and

EMBARK TECHNOLOGY, INC. f/k/a NORTHERN GENESIS ACQUISITION CORP. II,

Nominal Defendant.

Case No.:

DEMAND FOR JURY TRIAL

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Verified Shareholder Derivative Complaint

## INTRODUCTION

Plaintiff Josh Luberisse ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Embark Technology, Inc. f/k/a Northern Genesis Acquisition Corp. II ("Embark" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Ian Robertson ("Robertson"), Paul Dalglish ("Dalglish"), Chris Jarratt ("Jarratt"), Robert Schaefer ("Schaefer"), and Brad Sparkes ("Sparkes") (collectively, the "NGA Defendants"), and Ken Manget ("Manget"), Alex Rodrigues ("Rodrigues"), Richard Hawwa ("Hawwa"), Brandon Moak ("Moak"), Elaine Chao ("Chao"), and Pat Gardy ("Grady") (collectively with the NGA Defendants, the "Individual Defendants," and together with Embark, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Embark, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; against Defendants Robertson, Manget, Dalglish, Jarratt, Schaefer, and Sparkes for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); against Defendants Robertson, Manget, Jarratt, Dalglish, Schaefer, Sparkes, Rodrigues, and Hawwa for contribution under Sections 11(f) of the Securities Act and 21D of the Exchange Act; and against Defendants Rodrigues, Hawwa, Moak, Chao, and Grady (collectively, the "Legacy Embark Defendants") for aiding and abetting the NGA Defendants' breaches of fiduciary duties. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Embark, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist

for the allegations set forth herein after a reasonable opportunity for discovery

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Company directors and officers from January 15, 2021 and January 5, 2022 (the "Relevant Period"). Between July 2, 2021 and November 24, 2021, specifically, certain of the Individual Defendants made and/or caused the Company to violate pertinent accounting rules and to make false and misleading statements and omissions in Embark's financial statements filed with the SEC (the "False & Misleading Statements Relevant Period").

2.      Embark is a Delaware corporation headquartered in San Francisco, California. It is an autonomous vehicle company that builds software for carriers to enable autonomous trucks within their fleets. The Company offers software as a service product ecosystem, such as Embark driver, Embark universal interface, and Embark guardian.

3.      The Company was originally a special purpose acquisition company ("SPAC") named Northern Genesis Acquisition Corp. II ("NGA") and was formed for the purpose of effecting a merger, stock exchange, acquisition, reorganization, or similar business combination with one or more businesses. It had its initial public offering ("IPO") on January 15, 2021.

4.      In the related prospectus, which the Company filed with the SEC in connection with the IPO, the Company reassured the stockholders that the Company's management team had significant experience identifying, evaluating and acquiring businesses, and would conduct a thorough due diligence review before making any such determinations.

5.      The Company filed a merger agreement with the SEC on June 22, 2022, in which it announced that it would be merging with Embark Trucks, a Delaware Corporation ("Legacy Embark"). Legacy Embark was a startup company that developed self-driving truck technology designed for freight and logistic services.

6.     The Company and Legacy Embark issued a joint press release on June 23, 2021, in which the Company announced that it will merge with Legacy Embark (the "Merger").  The Company assured the public that it would work with Legacy Embark and make sure it transitions to a "great public company."

7.     The Company filed a Form S-4 registration statement with the SEC on July 2, 2021, which became effective on October 18, 2021 (the "Registration Statement"). The Registration Statement included a preliminary proxy statement and prospectus for a special meeting with Company shareholders to vote on the Merger (the "Preliminary Proxy Statement"). The Preliminary Proxy Statement was filed as definitive on October 19, 2021 and contained NGA's condensed financial statements for the three and six months ending on June 30, 2021, and also included materially false and misleading statements.

8.     On October 6, 2021, the Company sent the preliminary Proxy Statement to its shareholders, in order for the shareholders to approve the Merger proposed during a November 9, 2021 special meeting.

9.     NGA shareholders approved the Merger proposal during the special meeting held on November 9, 2021.

The Company officially merged with Legacy Embark on November 10, 2021, and changed its name from "Northern Genesis Acquisition Corp. II" to "Embark Technology, Inc."

10.     On November 10, 2021, before the market opened on the same day that the Merger closed, the Company filed a Form 10-Q with the SEC for the quarter ended September 30, 2021 ("3Q21"). In the 3Q21, the Company disclosed a "revision" to its previously issued financial statements, noting that there was a "reclassification error" for the statements as of September 30, 2021. The Company stated that the errors were related to the temporary equity and permanent equity for stockholders.

11.     However, the purported reclassification error was more significant than initially presented. It ultimately required the Company to disclose much more than it did in the partial disclosure in the 3Q21. It should have included the impact of the error on the

Company's financials as of and for the three and nine months ended June 30, 2021 or on the Company's financials as of for the three and nine months ended September 30, 2021, as well.

12.     Further, the disclosure failed to address that the errors would require the Company to ultimately issue a restatement. The disclosure also failed to address that the Company violated U.S. Generally Accepted Accounting Principles ("GAAP") rules that have been around since 2009. Moreover, the Company did not maintain effective internal controls over financial reporting.

13.     On November 17, 2021, the Company filed a Form 8-K with the SEC ("November 2021 8-K"). The November 2021 8-K disclosed that Company's "audited balance sheet as of January 15, 2021 and the Company's unaudited financial statements as of March 31, 2021 and for the three months ended March 31, 2021 should no longer be relied upon." The Company stated those statements would need to be restated and were unreliable because of the reclassification of all the Company's public shares as temporary equity.

14.     Due to this news, Embark's share price fell to $7.17 per share at the close of November 18, 2021, which is a fall of $0.72 per share or approximately 9% per share. [1]

15.     The Company filed an amended Form 10-Q/A with the SEC on November 24, 2021, to its 3Q21 ("Amended 3Q21"). In the Amended 3Q21, the Company disclosed that it issued a restatement for its condensed financial statements as of January 15, 2021, as of and for the three months ended March 31, 2021, as of and for the three and six months ended June 30, 2021, and for three and nine months ended September 30, 2021 (the "Restatement") because it made an accounting error in classifying the redeemable common stock.

---

[1] On August 16, 2022, Embark Technology announced a 1-for-20 reverse stock split. Embark's Class A shares started to trade on a split-adjusted basis when the market opened on August 17, 2022. The split adjusted price per share on the close of November 18, 2022, was $143.40, which was approximately $14 per share lower than the previous close.

16.     Notably, as a SPAC, it was necessary for the Company to maintain its stockholders' equity above $5,000,000 because the Company could only complete its Merger if the Company had net tangible assets if at least $5,000,001 under the Company's charter. Therefore, to continue to exist as a SPAC company, the Company incorrectly classified some of its public shares as "shares not subject to redemption."

17.     However, with respect to the applicable accounting guidance at the time when the financial statements were issued, the misclassification of the shares was completely wrong. GAAP provides guidance that SPACs must consider in determining whether to classify shares issued in the legal form of equity if they are redeemable at: (a) a fixed/determinable price on a fixed/determinable date; (b) the holder's option; or (c) when an event outside the control of the issuer occurs. After re-evaluating, the management of the Company determined that the public shares included a set of provisions that required the Company to reclassify the public shares as temporary equity, despite the fact that the Company was required to hold a threshold of $5,000,000 in order to complete the Merger.

18.     The Company issued the Restatement to disclose the material errors that were made in the Company's prior financial statements as a result of the improper classification. The material errors were related to the reported stockholders' equity, which was essential in determining if the Company could continue to operate as a SPAC as a public company. Due to the Company's material errors, it also had to adjust the reported earnings per share ("EPS") and other factors that affected the additional paid in capital with stockholders' equity on the balance sheet.

19.     After this news came out, Embark's shares fell to a close at $8.01 per share on November 24, 2021, which is a fall of $0.51 or approximately 6% from the previous close. [2]

---

[2] On August 16, 2022, Embark Technology announced a 1-for-20 reverse stock split. Embark's Class A shares started to trade on a split-adjusted basis when the market opened on August 17, 2022. The split adjusted price per share on the close of November 24, 2022, was $160.20, which was approximately $10 per share lower than the previous close.

20.     These material errors were essential for investors because the misclassification caused the Company's financial statements to report the wrong EPS. Moreover, the errors caused the Company to incorrectly report other material financial information. These are some of the most important factors that investors consider before deciding to invest into a Company, so it is necessary for them to be correctly reported. Further, the basis on which the SPAC was continuing to operate was misstated on the financial statements.

21.     EPS is a very important measure of the health and profitability of any corporation. EPS is a financial ratio that calculates how much profit the company is generating per share. In other words, it tells the shareholders how much money they would receive if the company were to be liquidated.

22.     Soon after the Merger, more disappointing news hit the market. On January 6, 2022, a report published by The Bear Cave entitled "Problems at Embark Technology" (the "Bear Cave Report"), revealed that "Embark appears to lack true economic substance," and that the "company holds no patents, has only a dozen or so test trucks, and may be more bark than bite."

23.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements about Embark. Specifically, they willfully or recklessly made and/or caused the Company to make to the investing public certain statements that were materially false and misleading in the Registration Statement and documents related thereto which contained material errors that required the Company to issue a restatement for such financial statements to be in accordance with GAAP and failed to disclose that: (1) the impact of the error on the Company's financials as of and for the three and six month ended June 30, 2021, or as of and for the three and none months ended September 30, 2021; (2) the disclosures failed to mention that treating this error as a restatement instead of a revision would require the Company to make adjustments to and

the reissuance of the amounts reflected in the prior financial statements as compared to making a revision only to the January 15, 2021 financial statements; (3) the disclosures failed to mention that the Company violated the GAAP rules surrounding the accounting of temporary and permanent equity that had been in practice since 2009; and (4) the Company failed to maintain adequate internal controls. As a result, Embark's public statements were materially false and misleading at all relevant times.

24.     Separate and apart from the aforementioned misconduct, the NGA Defendants breached their fiduciary duties by causing the Company to acquire Legacy Embark via the Merger, despite that: (1) Legacy Embark had no patents or significant testing trucks; (2) Legacy Embark was working with autonomous driving technology that is highly complex and faced significant regulatory and technological challenges; and (3) Legacy Embark had an unproven business model and limited operating experience. As such, the Merger was unfavorable to the NGA shareholders (the "Overpayment Misconduct").

25.     The Individual Defendants further made and/or caused the Company to make material accounting errors in its financial reports during the False & Misleading Statements Period and failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact until the Company was forced to restate its financial reports, rendering them personally liable to the Company for breaching their fiduciary duties.

26.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls. As stated in the Company's Amended 3Q21, "The Company previously identified a material weakness in internal controls related to the accounting for warrants issued in connection with our initial public offering. As a result of the restatement described in this First Amendment on Form 10-Q/A, the Company has concluded there was a material weakness in the Company's internal control over financial reporting at the time the abovementioned financial statements were issued, and its disclosure controls and

procedures were not effective at the time the abovementioned financial statements were issued.

27.     The Legacy Embark Defendants aided and abetted the NGA Defendants' breaches of fiduciary duties. The Legacy Embark Defendants were on Legacy Embark's Board throughout the entire Merger process and became members of the Company's Board after the Merger. Per their own due diligence, the Legacy Embark Defendants knew or should have known that there were material errors in the Company's prior financial statements. Defendant Rodrigues signed the definitive Proxy Statement that contained false and misleading statements. Furthermore, the Legacy Embark Defendants were on the Board of the Company when the Company issued a partial disclosure of the reclassification error. The partial disclosure was inadequate and lacked important information.

28.     In light of the Individual Defendants' misconduct—which has subjected the Company, its current Chief Executive Officer ("CEO") & Chief Financial Officer ("CFO"), its former CEO and CFO, and former and current members of its Board of Directors ("Board") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action").

29.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants Rodrigues, Hawwa, and Roberston's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Embark's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

30.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

31.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Act and Exchange Act.

32.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

33.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

34.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation with principal executive offices in this District and conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of California or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

35.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and Embark is headquartered in this District.

**PARTIES**

**Plaintiff**

36.    Plaintiff is a current shareholder of Embark common stock. Plaintiff has continuously held Embark common stock at all relevant times.

**Nominal Defendant Embark**

37.    Embark is a Delaware corporation headquartered at 424 Townsend Street San Francisco, CA 94107 United States. Embark's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "EMBK."

9

Verified Shareholder Derivative Complaint

**Defendant Robertson**

38.     Defendant Robertson has served on Embark's Board since November 2021. He is also a member of the Company's Audit and Nominating and Corporate Governance Committees. Defendant Robertson served as NGA's CEO and a member of its Board until the Merger. According to the Company's proxy statement filed on Schedule 14A with the SEC on April 26, 2022 (the "2022 Proxy Statement"), as of April 12, 2022, Defendant Robertson beneficially owned 304,357 shares of the Company's common stock, representing more than 5% of the Company's total outstanding common stock as of that date. Given that the price per share of the Company's common stock at the close of trading on April 12, 2022 was $5.10, Defendant Robertson beneficially owned approximately $1.6 million worth of Embark's stock.

39.     The 2022 Proxy Statement stated the following regarding Defendant Robertson:

> ***Ian Robertson*** has served on our board since November 2021. One of NGA's founders, Mr. Robertson has served as its Chief Executive Officer and a member of its Board of Directors since its formation. He also served as the Vice Chair of the Board of Directors of Northern Genesis Acquisition I from June 2020 until consummation of its initial business combination in May 2021 and has served as Chief Executive Officer and a member of the Board of Directors of Northern Genesis Acquisition III since its formation in January 2021. Mr. Robertson is an active senior business professional and currently leads Northern Genesis Capital Corp., an infrastructure investment fund management company. In July 2021, he was appointed Co-Chair of the Board of Directors of Largo Resources Ltd. (TSX: LGO) (NASDAQ: LGO) and interim President of Largo Clean Energy Corp., a subsidiary of Largo Resources Ltd. Mr. Robertson co-founded APCI in 1988 and previously served as Chief Executive Officer and Director of Algonquin Power & Utilities Corp. from October 2009 through July 2020. During his leadership tenure, Algonquin grew to become one of Canada's largest power and utilities companies, serving regulated electricity, natural gas and water utility customers in the United States and Canada and owning and operating a large portfolio of global renewable wind and solar powered generation capacity. He has more than 30 years of experience in the origination and execution of global infrastructure investment initiatives and is committed to the concept of

sustainable investing. Mr. Robertson previously served on the Board of Directors of Atlantica Sustainable Infrastructure plc (NASDAQ: AY), a publicly listed affiliate of Algonquin traded on the NASDAQ exchange. Mr. Robertson received an electrical engineering degree from the University of Waterloo, a Master of Business Administration from York University, and a Master of Law from the Law School of the University of Toronto. He is a professional engineer and holds a Chartered Financial Analyst designation.

**Skills and Qualifications**: We believe Mr. Robertson is well-qualified to serve on our board of directors due to his business experience and contacts and relationships.

## Defendant Manget

40.     Defendant Manget has served as NGA's CFO from before the start of the Class Period until the merger. Manget has also served as NGA's Board from June 2020 to November 2021. According to the Form 3 filed with the SEC on January 13, 2021 ("Initial Statement of Beneficial Ownership of Securities"), Defendant Manget had a non-controlling interest and owned 10,350,000 founder shares of common stock. The statement stated that:

The reporting person is a member of and holds a non-controlling interest in the Issuer's sponsor, Northern Genesis Sponsor II LLC (the "Sponsor"), which beneficially owns 10,350,000 shares of common stock ("Founder Shares") and will beneficially own 5,966,667 warrants (or up to 6,686,667 warrants if the underwriters in the Issuer's initial public offering exercise their over-allotment option in full), each warrant entitling the holder to purchase one share of common stock at a price of $11.50 per share, subject to adjustment.

41.     According to NGA's Registration Statement:

***Ken Manget***, one of our founders, has served as our Chief Financial Officer since June 2020. From 2014 to 2019, Mr. Manget served as Global Head, Relationship Investing at the Ontario Teachers' Pension Plan where he ran teams in Hong Kong, London and Toronto, and was responsible for a diversified portfolio of pre-IPO, public and private equity investments. After leaving Ontario Teachers' Pension Plan, he has been active as a private investor and director of companies. From 2009 to 2014, Mr. Manget served as Head of Investment Banking at Desjardins Capital Markets. He started his career at Schlumberger, Inc. as a Field Engineer in Latin America. His finance

background includes positions at: Salomon Brothers in London and New York (from 1986 to 1988), and at BMO Capital Markets in Toronto (from 1992 to 2009) where he had exposure to a broad range of capital markets/investment banking activities including: mergers & acquisitions, equities, fixed income, derivatives and securitization. Mr. Manget is a past board member of St. Joseph's Health Centre Foundation, the Heart and Stroke Foundation, is currently a member of the Board of the Canadian Ditchley Foundation, and serves an alumnus volunteer for Harvard University. He also currently serves on the Board of NASDAQ listed Organigram Holdings Inc. (NASDAQ: OIG) where he is a member of the audit, compensation and investment committees. He holds a Mechanical Engineering degree from the University of Toronto, a M.B.A from the Harvard Business School, and an ICD.D designation granted by the Institute of Corporate Directors, at the University of Toronto.

**Defendant Jarratt**

42.     Defendant Jarratt has served on the Company's Board and Chair of the Board since from November 2020 to November 2021. According to the Initial Statement of Beneficial Ownership of Securities, Defendant Jarratt had a non-controlling interest and owned 10,350,000 founder shares of common stock. The statement stated that:

> The reporting person is a member of and holds a non-controlling interest in the Issuer's sponsor, Northern Genesis Sponsor II LLC (the "Sponsor"), which beneficially owns 10,350,000 shares of common stock ("Founder Shares") and will beneficially own 5,966,667 warrants (or up to 6,686,667 warrants if the underwriters in the Issuer's initial public offering exercise their over-allotment option in full), each warrant entitling the holder to purchase one share of common stock at a price of $11.50 per share, subject to adjustment.

43.     According to NGA's Registration Statement:

> ***Christopher Jarratt***, one of our founders, has served as a member of our board of directors and our Non-Executive Chairman since June 2020. Mr. Jarratt is an active senior business professional. In 1988, he co-founded APCI, a private independent power developer formed in 1988 which was the predecessor organization to Algonquin Power & Utilities Corp. (TSX: AQN and NYSE: AQN), a publicly listed company traded on the TSX and NYSE, and has served as Executive Vice Chair for Algonquin Power & Utilities Corp. since October 2009. Mr. Jarratt brings more than 30 years of experience in the origination, development and operations of global infrastructure investment initiatives and is committed to the concept of best of class governance and

sustainable investing. Mr. Jarratt currently serves on the Board of Directors of Atlantica Sustainable Infrastructure plc (formerly Atlantica Yield plc). Mr. Jarratt is a professional engineer and holds an engineering degree specializing in water resources from the University of Guelph. In addition, Mr. Jarratt holds the designation of Chartered Director from McMaster University. We believe Mr. Jarratt is well-qualified to serve on our board of directors due to his business experience and contacts and relationships.

**Defendant Dalglish**

44.     Defendant Dalglish has served on the NGA's Board from June 2020 to November 2021. According to the Initial Statement of Beneficial Ownership of Securities, Defendant Dalglish had a non-controlling interest and owned 10,350,000 founder shares of common stock. The statement stated that:

> The reporting person is a member of and holds a non-controlling interest in the Issuer's sponsor, Northern Genesis Sponsor II LLC (the "Sponsor"), which beneficially owns 10,350,000 shares of common stock ("Founder Shares") and will beneficially own 5,966,667 warrants (or up to 6,686,667 warrants if the underwriters in the Issuer's initial public offering exercise their over-allotment option in full), each warrant entitling the holder to purchase one share of common stock at a price of $11.50 per share, subject to adjustment.

45.     According to NGA's Registration Statement:

> ***Paul Dalglish***, one of our founders, has served as a member of our board of directors since June 2020. Mr. Dalglish is an experienced operations and information technology executive, specializing in the design and delivery of systems providing operational excellence. Mr. Dalglish brings global experience in the delivery of technology-enabled transformations with global clients and has led large global employee and contractor teams. He has led business development and contract negotiation teams for large outsourcing contracts. Since June 2019, Mr. Dalglish has served as Vice President of Operations for JANA Corporation, a utility services company providing risk assessment programs to the North American natural gas industry. From 2016 to August 2019, Mr. Dalglish served as President of Hibernia Solutions Inc., a provider of pre- and post-acquisition support to utilities and utility-related companies. From 2008 to 2015, Mr. Dalglish was with Serco Canada Inc., a multi-national government outsourcing company, initially serving as a Managing Director of its subsidiary Serco-DES Inc. and later serving as its President. Previously, Mr. Dalglish focused on the acquisition and integration

of new businesses on behalf of Accenture's utility outsourcing business. Mr. Dalglish previously served on the Board of Directors and Audit Committee for AirSource Power Fund I LP, a publicly listed renewable energy company and currently sits on the Boards of several not-for-profit organizations. Mr. Dalglish has been accredited as a Chartered Director by McMaster University, holds a Professional Engineer designation through his Bachelor of Science from the University of Waterloo and has been awarded a Master of Business Administration from the University of Western Ontario. We believe Mr. Dalglish is well-qualified to serve on our board of directors due to his business experience and contacts and relationships.

**Defendant Schaefer**

46.     Defendant Schaefer has served on NGA's Board from July 2020 to November 2021. According to the Initial Statement of Beneficial Ownership of Securities, Defendant Schaefer had a non-controlling interest and owned 10,350,000 founder shares of common stock. The statement stated that:

> The reporting person is a member of and holds a non-controlling interest in the Issuer's sponsor, Northern Genesis Sponsor II LLC (the "Sponsor"), which beneficially owns 10,350,000 shares of common stock ("Founder Shares") and will beneficially own 5,966,667 warrants (or up to 6,686,667 warrants if the underwriters in the Issuer's initial public offering exercise their over-allotment option in full), each warrant entitling the holder to purchase one share of common stock at a price of $11.50 per share, subject to adjustment.

47.     According to NGA's Registration Statement:

> ***Robert Schaefer,*** one of our founders, has served as a member of our board of directors since July 2020. Mr. Schaefer is an active business professional. Since 2017, he has served as the Executive Vice President and Chief Financial Officer for the Ascendant Group Limited, the parent of Bermuda Electric Company. Mr. Schaefer is an executive with a track record of repositioning and growing businesses through his experience leading business units, undertaking mergers and acquisitions and completing finance transactions in Bermuda, Canada, U.S. and Europe. Mr. Schaefer has been responsible for significant capital deployment in growth investments, negotiation of long-term contract restructurings and company sales and acquisitions. From 2015 to 2017, Mr. Schaefer led the strategic restructuring of Maxim Power Corp. including the successful divestiture of European and US power businesses. From 2008 through 2015, Mr. Schaefer was responsible for TransAlta

Corporation's energy marketing business unit and business development activities. Mr. Schaefer holds a Bachelors of Commerce from the University of Calgary and is a member of the Institute of Chartered Accountants of Alberta and Bermuda. We believe Mr. Schaefer is well-qualified to serve on our board of directors due to his business experience and contacts and relationships.

**Defendant Sparkes**

48.     Defendant Sparkes has served on NGA's Board from June 2020 to November 2021.  According to the Initial Statement of Beneficial Ownership of Securities, Defendant Sparkes had a non-controlling interest and owned 10,350,000 founder shares of common stock. The statement stated that:

> The reporting person is a member of and holds a non-controlling interest in the Issuer's sponsor, Northern Genesis Sponsor II LLC (the "Sponsor"), which beneficially owns 10,350,000 shares of common stock ("Founder Shares") and will beneficially own 5,966,667 warrants (or up to 6,686,667 warrants if the underwriters in the Issuer's initial public offering exercise their over-allotment option in full), each warrant entitling the holder to purchase one share of common stock at a price of $11.50 per share, subject to adjustment.

49.     According to NGA's Registration Statement:

> ***Brad Sparkes***, one of our founders, has served as a member of our board of directors since June 2020. Mr. Sparkes is an active senior business professional. He co-founded and has served as President and Chief Executive Officer for BowArk Energy Ltd, a wind energy developer, since September 2003. Since its inception, BowArk has successfully developed a number of renewable energy projects across Canada. Mr. Sparkes previously held the position of Chief Financial Officer and Director for AirSource Power Fund LP which successfully completed the construction of the St. Leon Wind Energy Facility. Prior to BowArk, Mr. Sparkes gained extensive experience in developing and financing power projects across North America. From 2000 to 2003, Mr. Sparkes was Director of Business Development of Calpine Canada where he led its acquisitions and development team focusing on the natural gas-fired energy sector successfully developing and financing a number of projects in the North American energy sector. Prior to joining Calpine, he was a member of TransAlta Energy Corporation's business development team from 1996 to 2000, also focusing on natural gas-fired energy sector in Canada. Mr. Sparkes holds an Engineering degree from

the University of Calgary. We believe Mr. Sparkes is well-qualified to serve on our board of directors due to his business experience and contacts and relationships.

**Defendant Rodrigues**

50.     Defendant Rodrigues is the CEO of Embark and has been serving on the Company's Board since November 2021. Previously, Defendant Rodrigues was also the Co-founder and the CEO of Legacy Embark. According to the 2022 Proxy Statement, as of April 12, 2022, Defendant Rodrigues beneficially owned 50,034,332 shares of the Company's class B common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2022 was $5.10, Defendant Rodrigues beneficially owned approximately $255 million worth of Embark's stock.

51.     For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Rodrigues received $57,391,582 in total compensation from the Company. This included $180,000 in salary and $57,211,582 in stock awards.

52.     The 2022 Proxy Statement stated the following regarding Defendant Schultz:

*Alex Rodrigues* co-founded Embark and has served as our Chief Executive Officer since the company's founding in 2016. Mr. Rodrigues has an extensive background in robotics, beginning with a world robotics championship win as a middle school student in 2009. Mr. Rodrigues studied at the University of Waterloo, where he built Canada's first self-driving vehicle, a golf cart that was used to take guests on tours of the campus. Mr. Rodrigues is a 2016 Thiel Fellowship recipient and was accepted into Silicon Valley startup incubator Y-Combinator, where he launched Embark. Under Mr. Rodrigues's tenure as Chief Executive Officer, Embark has achieved a number of industry firsts as it commercializes autonomous freight: Embark was the first self-driving truck company to achieve an autonomous coast-to-coast drive, the first to reach 100,000 miles driven on public roads, and the first to open transfer points.

**Skills and Qualifications**: We believe that Mr. Rodrigues is highly-qualified to serve as a member of our board of directors due to his longtime leadership of our company, deep business experience in the autonomous trucking sector, and technical expertise in robotics.

**Defendant Hawwa**

53.    Defendant Hawwa is Embark's CFO since November 2021. Previously, he served as the Legacy Embark's CFO from May 2021 till November 2021. According to the 2022 Proxy statement, as of April 12, 2022, Defendant Hawwa beneficially owned 1,211,846 shares of the Company's class A common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2022 was $5.10, Defendant Hawwa beneficially owned approximately $6.2 million worth of Embark's stock.

54.    For the 2021 Fiscal Year, Defendant Hawwa received $37,726,346 in total compensation from the Company. This included $228,846 in salary, $87,500 in bonus, and $37,410,000 in stock awards.

55.    The 2022 Proxy Statement stated the following about Defendant Hawwa:

***Richard Hawwa*** has served as our Chief Financial Officer since May 2021. Mr. Hawwa has more than 15 years of investment banking experience. Prior to joining us, Mr. Hawwa most recently served as a Managing Director at Citigroup, responsible for coverage of a variety of industrial and technology companies across the global mobility sector. Mr. Hawwa began his career as an analyst in the investment banking division at UBS. Throughout his career, Mr. Hawwa's primary responsibilities included working with companies assisting on capital raising transactions and advising on strategic matters. Prior to assuming mobility sector coverage responsibility, Mr. Hawwa specialized in M&A, working across a diverse set of disruptive and traditional sectors, including biotechnology, medical device technology, financial technology, diversified industrials and energy. Mr. Hawwa has advised and assisted on a variety of complex transactions with an aggregate transaction value of more than $125 billion in North America, Europe and Asia. Mr. Hawwa graduated in three years with honors from Southern Methodist University with a Bachelor of Business Administration in Finance and a minor in Economics.

**Defendant Chao**

56.    Defendant Chao has served on the Company's Board since November 2021. She is also a member of the Company's Audit Committee. Previously, Defendant Chao

served on the Legacy Embark's Board. According to the 2022 Proxy statement, as of April 12, 2022, Defendant Chao beneficially owned 419,485 shares of the Company's class A common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2022 was $5.10, Defendant Chao beneficially owned approximately $2.1 million worth of Embark's stock.

57.    For the 2021 Fiscal Year, Defendant Chao received $2,427,953 in total compensation from the Company. This included $100,698 fees earned or paid in cash and $2,327,254 in stock awards.

58.    The 2022 Proxy Statement stated the following about Defendant Chao:

***Secretary Elaine Chao*** has served on our board since November 2021 and has also served as a member of Embark Trucks Inc.'s board of directors from June 2021. Secretary Chao is the former U. S. Secretary of Labor and the former U.S. Secretary of Transportation. She is the first Asian Pacific American woman to be appointed to a President's cabinet in American history. Prior to being appointed Secretary of Labor, she was President and CEO of United Way of America, Director of the Peace Corps, Deputy Secretary of U.S. Department of Transportation, Chair of the Federal Commission. She has also worked in the private sector as vice president of Syndications for BankAmerica Capital Markets Group and Citibank. Secretary Chao has also been a director on a number of Fortune 100 public and nonprofit boards. She is recipient of 37 honorary doctorate degrees. Secretary Chao has a MBA from Harvard Business School.

**Skills and Qualifications**: We believe Secretary Chao's extensive leadership experience in high profile positions at large, complex organizations in the public, private and non-profit sectors brings valuable perspective to matters relevant to the Company in the areas of global competitiveness, international geopolitical dynamics, workforce development, trends in governmental policies and corporate governance. In particular, Secretary Chao's service as U.S. Secretary of Transportation provides extensive knowledge and experience regarding safety, and the importance of innovation and infrastructure in our nation's economic competitiveness. Her service as U.S. Secretary of Labor provides extensive knowledge and experience regarding labor and employment trends, workforce health and safety, pension benefits and competition in a worldwide economy. Secretary Chao's ongoing board

memberships in the financial and communications industries also provide further insight into finance, macroeconomics and new media developments.

**Defendant Grady**

59.    Defendant Grady has served as a Company director since November 2021. She was also the chair of the Board's Compensation Committee and is a member of Board's Corporate Governance Committee. According to the 2022 Proxy statement, as of April 12, 2022, Defendant Grady beneficially owned 53,886,635 shares of the Company's class A common stock which accounts for 14.9% of the Company's total Common A stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2022 was $5.10, Defendant Grady beneficially owned approximately $275 million worth of Embark's stock.

60.    The 2022 Proxy Statement stated the following about Defendant Grady:

***Pat Grady*** has served on our board since November 2021 and has also served as a member of Embark Truck Inc.'s board of directors from May 2018. Mr. Grady currently serves as a Partner at Sequoia Capital, which he joined in 2007, and is responsible for Sequoia Capital's growth-stage investment business. Mr. Grady is an active senior business professional, and currently serves as a director of multiple companies, including, Amplitude, Attentive, Cribl, Drift, Namely, Okta (OKTA), and Pilot. These ongoing memberships provide insight into the enterprise technology and financial services industry and developments. During his career, he has also worked with companies such as HubSpot (HUBS), Jive Software, MarkLogic, Medallia (MDLA), OpenDNS, Qualtrics (XM), ServiceNow (NOW), Snowflake (SNOW), Sumo Logic (SUMO), Sunrun (RUN), and Zoom (ZM), among others. Mr. Grady received a Bachelor of Science degree from Boston College.

**Skills and Qualifications**: We believe Mr. Grady is well-qualified to serve on our board of directors due to his extensive experience in working with and serving at the boards of growth-stage businesses

**Defendant Moak**

61.    Defendant Moak is Embark's Chief Technology Officer and has served as a Company's director since November 2021. Previously, Defendant Moak co-founded Legacy Embark and served as its Chief Technology Officer. According to the 2022 Proxy

statement, as of April 12, 2022, Defendant Moak beneficially owned 37,044,649 shares of the Company's class B common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2022 was $5.10, Defendant Moak beneficially owned approximately $189 million worth of Embark's stock.

62.  For the 2022 Fiscal Year, Defendant Moak received $30,985,652 in total compensation from the Company. This included $180,000 in salary and $30,805,652 in stock awards.

63.  The 2022 Proxy Statement said the following about Defendant Moak:

***Brandon Moak*** co-founded Embark and has served as our Chief Technology Officer since the company's founding in 2016. In his role, he leads engineering and R&D at our company, and has overseen development of the Embark Driver software, the core of Embark's commercialization effort. Mr. Moak has also led the design and development of the Embark Universal Interface, a first-of-its-kind set of standardized self-driving components and flexible interfaces necessary for major truck OEMs to more easily and robustly integrate Embark's autonomous technology onto their vehicle platforms. Mr. Moak previously worked as a robotics engineer and a software developer, respectively, at technology companies Kindred.ai and Clear Blue Technologies. Mr. Moak is an alumnus of the University of Waterloo where he studied mechatronics engineering. Mr. Moak has served on our board of directors since our inception and will continue in this role.

**Skills and Qualifications**: We believe Mr. Moak is highly-qualified to serve as a member of our board of directors due to his longtime leadership of research and development at the company, deep business experience in the autonomous trucking sector, and technical expertise in robotics.

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

64.  By reason of their positions as officers, directors, and/or fiduciaries of Embark and because of their ability to control the business and corporate affairs of Embark, the Individual Defendants owed Embark and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Embark in a fair, just, honest, and equitable manner. The Individual

Defendants were and are required to act in furtherance of the best interests of Embark and its shareholders so as to benefit all shareholders equally.

65.    Each director and officer of the Company owes to Embark and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

66.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Embark, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

67.    To discharge their duties, the officers and directors of Embark were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

68.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Embark, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Embark's Board at all relevant times.

69.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants, had a duty to prevent and not to effect the

dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

70.   To discharge their duties, the officers and directors of Embark were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Embark were required to, among other things:

(a)   ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Embark's own Code of Business Conduct & Ethics (the "Code of Conduct");

(b)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)   remain informed as to how Embark conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, such as the Cheating Misconduct and Copyright Infringement Misconduct, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)   establish and maintain systematic and accurate records and reports of the business and internal affairs of Embark and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Embark's operations would comply with all applicable laws and Embark's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

71. Each of the Individual Defendants further owed to Embark and the shareholders the duty of loyalty requiring that each favor Embark's interests and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

72. At all times relevant hereto, the Individual Defendants were the agents of each other and of Embark and were at all times acting within the course and scope of such agency.

73. Because of their advisory, executive, managerial, and directorial positions with Embark, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

74. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts

complained of herein, as well as the contents of the various public statements issued by Embark.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

75.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

76.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

77.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who was a director of Embark was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

78.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct

part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of their overall contribution to and furtherance of the wrongdoing.

79.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Embark and was at all times acting within the course and scope of such agency.

## EMBARK'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### *NGA Code of Ethics*

80.    In NGA's Registration Statement, NGA stated with regards to its "Code of Ethics" that:

> Prior to the effectiveness of this registration statement of which this prospectus forms a part, we will have adopted a Code of Ethics applicable to our directors, director nominees, officers and employees. We intend to disclose any amendments to or waivers of certain provisions of our Code of Ethics in a Current Report on Form 8-K. See "Where You Can Find Additional Information."

### *Embark's Code of Conduct*

81.    The introduction to Embark's Code of Conduct reads, in relevant part:

> This Code of Business Conduct and Ethics (the "Code") contains general guidelines for conducting the business of Company Technology, Inc. (the "Company" or "we") consistent with the highest standards of business ethics. To the extent this Code requires a higher standard than required by commercial practice or applicable laws, rules or regulations, the Company adheres to these higher standards.

82.    The Code of Conduct's introduction continues by stating that it "applies to our Directors, officers, and other employees (including employees we engage through certain third parties in jurisdictions outside the United States)."

83.    The Code of Conduct instructs regarding the accuracy of the Financial Reports and Other Public Communications:

> As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business,

financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

The Company's principal financial officers and other employees working in the finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

84. The Code of Conduct instructs that Company should have "Accurate and reliable" records and further states:

Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports, regulatory submissions and many other aspects of our business and guide our business decision-making and strategic planning. Company records include financial records, personnel records, records relating to our technology and product development, customer collaborations, manufacturing and regulatory submissions and all other records maintained in the ordinary course of our business.

All Company records must be complete, accurate and reliable in all material respects. Each employee and director must follow any formal document retention policy of the Company with respect to Company records within such employee's or director's control. Please contact your supervisor or the Company's Chief Legal Officer to obtain a copy of any such policy or with any questions concerning any such policy.

85. The Code of Conduct instructs that Embark personnel must "act in the best interests of the Company" and further stated that:

You must refrain from engaging in any activity or having a personal interest that presents a "conflict of interest" and should seek to avoid even the appearance of a conflict of interest. A conflict of interest occurs when your personal interest interferes with the interests of the Company. A conflict of interest can arise whenever you, as an employee, officer or director, take action or have an interest that prevents you from performing your Company duties and responsibilities honestly, objectively and effectively.

86.    Finally, the Code of Conduct states with regards to violation of Code of Conduct is that:

It is Company policy that any employee or director who violates this Code will be subject to appropriate discipline, which may include, for an employee, termination of employment or, for a director, a request that such director resign from the Board of Directors of the Company (the "Board of Directors"). This determination will be based upon the facts and circumstances of each particular situation.  If you are accused of violating this Code, you will be given an opportunity to present your version of the events at issue prior to any determination of appropriate discipline.  Employees and directors who violate the law or this Code may expose themselves to substantial civil damages, criminal fines and prison terms.  The Company may also face substantial fines and penalties and may incur damage to its reputation and standing in the community.  Your conduct as a representative of the Company, if it does not comply with the law or with this Code, can result in serious consequences for both you and the Company.

***NGA Audit Committee Charter***

87.    In NGA's Registration Statement, NGA stated with regards to its "Audit Committee Charter" that:

We will adopt an audit committee charter, which will detail the principal functions of the audit committee, including:
- the appointment, compensation, retention, replacement, and oversight of the work of the independent auditors and any other independent registered public accounting firm engaged by us;
- pre-approving all audit and non-audit services to be provided by the independent auditors or any other registered public accounting firm engaged by us, and establishing pre-approval policies and procedures;
- reviewing and discussing with the independent auditors all relationships the auditors have with us in order to evaluate their continued independence;
- setting clear hiring policies for employees or former employees of the independent auditors;
- setting clear policies for audit partner rotation in compliance with applicable laws and regulations;
- obtaining and reviewing a report, at least annually, from the independent auditors describing (i) the independent auditor's internal

quality-control procedures and (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the audit firm, or by any inquiry or investigation by governmental or professional authorities, within, the preceding five years respecting one or more independent audits carried out by the firm and any steps taken to deal with such issues;

- reviewing and approving any related party transaction required to be disclosed pursuant to Item 404 of Regulation S-K promulgated by the SEC prior to us entering into such transaction; and

- reviewing with management, the independent auditors, and our legal advisors, as appropriate, any legal, regulatory or compliance matters, including any correspondence with regulators or government agencies and any employee complaints or published reports that raise material issues regarding our financial statements or accounting policies and any significant changes in accounting standards or rules promulgated by the Financial Accounting Standards Board, the SEC or other regulatory authorities.

### *Embark's Audit Committee Charter*

88.    The Charter of the Audit Committee of the Board of Directors of Embark, Inc. (the "Audit Committee Charter") defines the responsibilities of the Board's Audit Committee.

89.    Per the Audit Committee Charter, the purpose of the Audit Committee is to "oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company." It further states that:

> The Committee's responsibilities are limited to oversight.  The Company's management is responsible for establishing and maintaining accounting policies and procedures in accordance with generally accepted accounting principles ("GAAP") and other applicable reporting and disclosure standards and for preparing the Company's financial statements. The Company's independent auditors are responsible for auditing and reviewing those financial statements.

90.    The Audit Committee Charter lists among the Audit Committee's responsibilities:

> *Appointment and Oversight*.  The Committee is directly responsible for the appointment, compensation, retention, oversight of the work and assessment

of qualifications, performance and independence of our independent auditor (including resolution of any disagreements between Company management and the independent auditor regarding financial reporting) and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company, and the independent auditor and each such other registered public accounting firm must report directly to the Committee. The Committee, or the Chair of the Committee, must pre-approve any audit and non-audit service provided to the Company by the independent auditor, unless the engagement is entered into pursuant to appropriate preapproval policies established by the Committee or if such service falls within available exceptions under SEC rules

\*          \*          \*

*Audit Problems*. The Committee must discuss with the independent auditor any audit problems or difficulties and management's response.

*Form 10-K Review.*  The Committee must review and discuss the annual audited financial statements and related disclosures, as well as critical accounting policies, with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

*Audit Committee Report.*  The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements. Discuss on a general basis the type of information to be disclosed and type of presentation to be made regarding financial information and earnings guidance to analysts and rating agencies, including, in general, the types of information to be disclosed and the types of presentation to be made (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information).

*Form 10-Q Review*. The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

\*          \*          \*

*Internal Control Over Financial Reporting*. The Committee must review the adequacy of the Company's internal control over financial reporting.

\*          \*          \*

*Review of Code of Business Conduct and Ethics*.  The Committee must periodically consider and discuss with management and the independent

auditor the Company's Code of Business Conduct and Ethics (the "Code"), the procedures in place to enforce the Code. Reports to the Board of Directors.

\*         \*         \*

The Committee must report regularly to the Board regarding the activities of the Committee.

91.    The Individual Defendants violated Embark's Code of Conduct by issuing materially false and misleading statements to the investing public, and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, supporting and profiting from unethical academic behavior, failing to avoid conflicts of interest, failing to respect the intellectual property rights of others, engaging in insider trading, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law.

92.    In violation of Embark's Code of Conduct, the Audit Committee Charter, and the Company's Corporate Governance documents, the Individual Defendants who were at the Company following the Merger conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and the aiding and abetting thereof. Also, in violation of the Company's corporate governance documents, the Individual Defendants who joined the post-Merger Company failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Furthermore, they failed to maintain internal controls.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background of NGA and the Merger

93.     A SPAC is a public shell company that is created to acquire private operating companies with the intention to bring those private operating companies public. A SPAC IPO is often structured to offer investors a unit of securities consisting of (1) shares of common stock and (2) warrants.  A warrant is a contract that gives the holder the right to purchase from the company a certain number of additional shares of common stock in the future at a certain price, often a premium to the current stock price at the time the warrant is issued.

94.     In a SPAC IPO, investors put their capital into a listed company that does not actually conduct any commercial activities. Given the fact that the business the SPAC will be acquiring is unknown at the time of the IPO, the investors in the IPO are essentially placing trust in the incorporators and management of the SPAC. A SPAC doesn't have operations or assets other than cash and limited investments. It offers securities for cash and places substantially all the offering proceeds into a trust or escrow account for future use in the acquisition of one or more private operating companies.

95.     The SPAC will identify target companies and attempt to complete one or more business combination transactions, after which, the SPAC will continue the operations of the acquired company or companies as a public company. A SPAC typically provides an 18-to-24-month period to identify and complete an initial business combination transaction.

96.     The incorporation documents or the equity agreements of a SPAC requires the public shareholders of the SPAC to vote on a transaction. That triggers pre-merger regulatory filings with extensive financial reporting and disclosures. SPACs are regulated by the SEC, and they have to follow the GAAP guidelines.

97.     According to the GAAP guidelines, for an entity to determine whether to classify shares issued in the legal form of equity as liability instruments, it needs to consider

if it represents (1) mandatorily redeemable financial instruments under ASC 480-10-25-14 or (2) unconditional obligations to deliver a variable number of equity shares that are liabilities under ASC 480-10-25-14. As SPACs are regulated by the SEC and need to register with the SEC, they need to consider the possibility that shares issued in the legal form of equity may require classification as temporary equity instruments under ASC 480-S99-3A if they are redeemable at: (i) A fixed or determinable price on a fixed or determinable date, (ii) the option of the holder, or, (iii) upon the occurrence of an event that is not solely within the control of the issuer

98.    NGA, a blank check company, or SPAC had its initial public offering on January 15, 2021. It sold the units at a price of $10 per unit generating $414 million in gross proceeds for the company.

99.    NGA filed a prospectus with the SEC in connection with the Company's IPO, in which it stated that its management team has significant experience in identifying and acquiring a business. It further stated that for evaluating prospective businesses, NGA will conduct a thorough due diligence review to determine if the business is worth acquiring or not. NGA's purpose was to acquire a business that had an ability to succeed if it was managed by NGA's team, network, and expertise.

100.    Legacy Embark was founded as a startup in 2016 as an autonomous vehicle company that builds software for autonomous trucks.

101.    NGA filed a merger agreement with Legacy Embark on June 22, 2022. NGA and Legacy Embark issued a joint press release on June 23, 2021, in which the Company assured the public that it will work with Legacy Embark and make sure it transitions to a "great public company."

102.    On November 10, 2021, NGA officially merged with Legacy Embark, and changed its name to Embark Technology, Inc. The shares of common stock were listed on the stock market under the symbol "EMBK." On November 18, 2021, the closing sale price of shares of the Class A common stock was $7.17. Company's warrants were listed on

stock market under the symbol "EMBKW." On November 18, 2021, the closing sale price of our warrants was $1.34.

### The Company Misclassified Material Information in its Financial Reports Leading up to the IPO

103.   There is usually a provision in a SPAC charter that indicates that the SPAC cannot redeem public shares that would cause its net tangible assets to be less than US $5,000,001 following such redemptions. The Company had the same provision in its charter. The Company's Registration Statement, stated that:

> Under the NGA Existing Charter, public holders of NGA public shares may elect to have their NGA public shares redeemed for cash at the applicable redemption price per share equal to the quotient obtained by dividing (a) the aggregate amount on deposit in the Trust Account as of two business days prior to the consummation of the Business Combination (including interest net of taxes payable), by (b) the total number of NGA public shares (the "Redemption Payment"); provided that NGA will not redeem any shares of NGA Common Stock to the extent that such redemption would result in NGA having net tangible assets (as determined in accordance with Rule 3a51-1(g)(1) of the Exchange Act) of less than $5,000,001. As of , 2021, the Redemption Payment would have amounted to approximately $10.00 per share.

104.   However, the Company admitted that it had failed to correctly classify the redeemable shares in its financial statements that were issued as of January 15, 2021, and March 31, 2021. The Company incorrectly classified the portion of its public shares as permanent equity so it can maintain stockholders' equity greater than $5,000,000. It was necessary for the Company to maintain its stockholders' equity above $5,000,000 because the Company could only complete its Merger if the Company had net tangible assets if at least $5,000,001 under the Company's charter. Therefore, in order to continue to exist as a SPAC company, the Company incorrectly classified some of its public shares as "shares not subject to redemption."

105.   An entity can classify its securities in one of following three categories: liability, permanent equity, and temporary equity. The classification on the balance sheet

is profoundly important because it affects how the returns will be reflected on the Company's income statement. If the Company classifies it as a liability, then the return on liability is reflected in the net income whereas if the Company classifies as an equity, then the returns on instrument are generally reflected on equity, without having any impact on the net income. Moreover, when the securities are classified as temporary equity, it may affect an entity's reported EPS because adjustments to the redemption amount are often treated as dividends which can change an essential element in calculating the EPS.

106.   EPS is a fundamental measure of the health and profitability of any corporation. The EPS is one of the most important factors an investor looks at before investing into an entity. EPS is a financial ratio that calculates how much profit the company is generating per share. In other words, it tells the shareholders how much money they would receive if the company were to be liquidated. However, NGA defendant's Misclassification Misconduct directly affected the Company's EPS. Thus, the Misclassification Misconduct concealed from the investing public the actual EPS of the Company.

107.   The NGA Defendants breached their fiduciary duties to the Company by causing it to engage in the Misclassification Misconduct, which misrepresented the true state of the Company's financial condition, and which remained undisclosed until the publication of the Report.

### **The Overpayment Misconduct**

108.   NGA, as a blank check company, had no operations of its own, but instead sought to combine with an operating company and take on that company's operations as its own. In such a transaction, the operating company, here Legacy Embark, benefits from the business combination by getting access to investment without being subjected to the more formal requirements imposed in the IPO process. The SPAC, here NGA, benefits if the combination with the target company is prudent and enhances the value of the SPAC's shares.

109. According to the Merger agreement filed on June 22, 2021, NGA agreed to acquire Legacy Embark for a base purchase price of $4.25 billion. According to the Preliminary Proxy Statement, the terms of the merger agreement between NGA and Legacy Embark provided, *inter alia*, as follows:

> [E]ach share of Embark common stock that is issued and outstanding immediately prior to the Effective Time (other than (i) any shares of Embark common stock subject to Embark Awards or warrants, (ii) any share of Embark common stock held in the treasury of Embark immediately prior to the Effective Time ("Treasury Shares"), which shall be canceled as part of the Business Combination, and (iii) any shares of Embark common stock electing to demand statutory appraisal rights due to the Business Combination ("Dissenting Shares")) (collectively, the "Exchange Shares"), will be canceled and converted into the right to receive the applicable portion of the number of shares of Embark Technology Common Stock equal to an exchange ratio equal to the quotient of (i) (a) the base purchase price of $4,250,000,000 (as adjusted pursuant to the terms of the Merger Agreement) *divided by* (b) $10.00 (the "Aggregate Merger Consideration") and the Aggregate Fully Diluted Company Common Shares (as defined in the Merger Agreement) (the "Exchange Ratio"). Each holder of Exchange Shares shall have its Exchange Shares converted into either (i) Embark Technology Class A Common Stock, or (ii) Embark Technology Class B Common Stock. The Merger closed on November 10, 2021, on the terms set forth in the merger agreement. NGA acquired all of the outstanding equity interests of Legacy Embark for approximately $4.25 billion in aggregate consideration.

110. These terms were unfavorable and unreasonable to NGA's shareholders, given that Legacy Embark suffered from a lot of issues. The Bear Cave Report that was published on January 6, 2022, stated that "Embark appears to lack true economic substance," and that the "company holds no patents, has only a dozen or so test trucks, and may be more bark than bite." The Bear Cave Report further asserted that Embark Technology was based on puffery rather than actual substance.

111. All those issues made Legacy Embark a less valuable acquisition than NGA's shareholders were led to believe. Thus, the NGA Defendants breached their fiduciary duties to the Company by causing it to acquire Legacy Embark on unfavorable terms.

112.   Legacy Embark relied heavily on its trade secrets and technological methods to run its business, but it held no patents. Legacy Embark relied on the fact that it would keep the competitors from reverse engineering its products. If Legacy Embark's trade secrets were to disclose in the future or a third-party reverse engineered the technology Legacy Embark heavily relied on, Legacy Embark had no right to prevent a third party from using it. After the Merger, the prospectus filed with respect to the related merger, filed on December 13, 2021, (the "Merger Prospectus") stated that "Embark plans in the future to apply for and obtain patents on its software and hardware products. To the extent Embark does so, Embark may need to engage in costly and time consuming activities to enforce such patents. Furthermore, there can be no assurance that any such patent applications will be granted or even that patents Embark does obtain will be sufficient to protect its intellectual property or will be issued in a timely fashion to deter infringement."

113.   Further, Legacy Embark business had a limited operating history and an unproven business model in a new market and faced significant challenges as this industry has been rapidly evolving. The Merger Prospectus stated that "there can be no assurance that an alternative model adopted by its competitors in the autonomous vehicle space will not prove superior."

114.   Furthermore, the autonomous driving technology is highly complex and new. The industry faces significant regulatory and technological challenges. Legacy Embark's autonomous driving technology and related hardware and software could have had undetected defects, errors or bugs in hardware or software. If this would be the case in the future, the Company would incur significant development, repair, and replacement costs. Not only that, but also it exposes the Company to tremendous future litigation costs including breach of contract, product liability, and tort liability. The Merger Prospectus stated that:

> Additionally, there may be undetected errors or defects especially as it introduces new systems or as new versions are released. These risks are particularly significant in the freight transport market given the high potential

value of each load, as any such errors or defects could result in costly delays or losses, leading to the delay or prevention of the adoption of autonomous driving technology in trucks. There can be no assurance that Embark will be able to detect and fix any defects in its products prior to their sale to or installation for customers. Errors or defects could result in costly delays or losses, leading to the delay or prevention of the f the adoption of autonomous driving technology in trucks.  There can be no assurance that Embark will be able to detect and fix any defects in its products prior to their sale to or installation for customers. Errors or defects in Embark's product may only be discovered after they have been tested, commercialized, and deployed.

115.   NGA Defendants knew or should have known that Legacy Embark's management team had limited experience managing a public company and most of the Board and the members of the management on the team after the merger were from Legacy Embark's Board and management team. Defendant Robertson was the only NGA member that ended up serving on the Board of Embark. The Merger Prospectus stated that:

> Legacy Embark may be subject to risks associated with potential future strategic alliances, partnerships, investments or acquisitions, all of which could divert management's attention, result in Embark incurring significant or acquisitions, all of which could divert management's attention, result in Embark incurring significant costs or operating difficulties and dilution to its stockholders, disrupt its operations and adversely affect its business, results of operations or financial condition.

116.   In light of these issues, the NGA Defendants breached their fiduciary duties to the Company by causing NGA to merge with Legacy Embark on terms that were unfavorable to the Company and its pre-Merger shareholders.

117.   Furthermore, it was highly likely that if Legacy Embark's autonomous vehicle technologies fail to perform as expected, are inferior to those of its competitors, or are perceived as less safe or more expensive than those of its competitors or non-autonomous vehicles, Embark's financial performance and prospects would be adversely impacted in the future.

118.   The NGA Defendants were required to know the state of Legacy Embark prior to the Merger in the course of conducting due diligence. However, despite knowing the

poor state of affairs of Legacy Embark and heightened risk of future problems, NGA Defendants agreed to the Merger.

119.    In breach of their fiduciary duties to the Company, the Individual Defendants engaged in the Overpayment Misconduct by causing NGA to acquire Legacy Embark on unfavorable terms to the Company's shareholders despite that Legacy Embark, *inter alia*: (1) Legacy Embark had no patents or significant testing trucks; (2) Legacy Embark was working with autonomous driving technology that is highly complex and faced significant regulatory and technological challenges; and (3) Legacy Embark had an unproven business model and limited operating experience.

**False and Misleading Statements**

***July 2, 2021, Registration Statement, Proxy Statement, and Prospectus***

120.    On July 2, 2021, the Company filed its Registration Statement. The Registration Statement was signed by Defendant Robertson, Manget, Jarratt, Dalglish, Schaefer, and Sparkes.

121.    The Registration Statement also included a Preliminary Proxy Statement and a prospectus. Defendant Robertson, Manget, Jarratt, Dalglish, Schaefer, and Sparkes solicited the preliminary Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

122.    On August 31, 2021, September 23, 2021 and October 10, 2021, the Company filed amendments to its Registration Statement (the "Amendments to the Form S-4").

123.    The Preliminary Proxy Statement stated the following with regards to the Company's Code of Ethics:

> NGA has adopted a code of ethics that applies to all of its executive officers, directors, and employees. The code of ethics codifies the business and ethical principles that govern all aspects of its business.

124.    The Preliminary Proxy Statement further stated:

> Embark Technology will have a code of ethics that applies to all of its executive officers, directors and employees, including its principal executive

officer, principal financial officer, principal accounting officer or controller or persons performing similar functions. The code of ethics will be available on Embark Technology's website, http://Embark.com/investors. Embark Technology intends to make any legally required disclosures regarding amendments to, or waivers of, provisions of its code of ethics on its website rather than by filing a Current Report on Form 8-K.

125.    With regards to the Company's Merger with Legacy Embark, the Preliminary Proxy Statement presented the proposal for the Merger stating that:

Proposal No. 1 — The Business Combination Proposal — to consider and vote upon a proposal to approve and adopt the Agreement and Plan of Merger, dated as of June 22, 2021 (the "Merger Agreement"), by and among NGA, NGAB Merger Sub Inc. ("Merger Sub"), a Delaware corporation and wholly owned subsidiary of NGA and Embark Trucks Inc. ("Embark"), a Delaware corporation, a copy of which is attached to this proxy statement/prospectus statement as Annex A. The Merger Agreement provides for, among other things, the merger of Merger Sub with and into Embark (the "Merger"), with Embark surviving the Merger as a wholly owned subsidiary of NGA (following such date, Embark Technology), in accordance with the terms and subject to the conditions of the Merger Agreement as more fully described elsewhere in this proxy statement/prospectus (the "Business Combination Proposal");

126.    The Preliminary Proxy Statement further stated that:

After careful consideration, the board of directors of NGA has unanimously approved the Business Combination and unanimously recommends that stockholders vote "FOR" adoption of the Merger Agreement, and approval of the transactions contemplated thereby, including the Business Combination, and "FOR" all other proposals presented to NGA's stockholders in this proxy statement/prospectus. When you consider the recommendation of these proposals by the board of directors of NGA, you should keep in mind that NGA's directors and officers have interests in the Business Combination that may conflict with your interests as a stockholder. See the section entitled "Proposal No. 1—The Business Combination Proposal — Interests of Certain Persons in the Business Combination" in this proxy statement/prospectus for a further discussion of these considerations.

127.    Regarding the redeemable public shares, the Preliminary Proxy Statement stated: "In addition, pursuant to the NGA Organizational Documents, in no event will NGA

redeem public shares in an amount that would cause NGA's net tangible assets (as determined in accordance with Rule 3a51-1(g)(1) of the Exchange Act) to be less than $5,000,001."

128.  In addition to the reasons below, Defendants Robertson, Manget, Dalglish, Jarratt, Schaefer, and Sparkes caused the Preliminary Proxy Statement to be false and misleading by failing to disclose that the Code of Ethics was not abided by as evinced by the accounting errors discussed herein and the fact that the NGA Defendants were engaging in the Overpayment Misconduct, soliciting the Merger with Legacy Embark without having conducted adequate due diligence.

129.  Defendants Robertson, Manget, Dalglish, Jarratt, Schaefer, and Sparkes caused the Preliminary Proxy Statement was materially false and misleading, and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, it contained material errors that required the Company to issue a restatement for such financial statements to be in accordance with GAAP and failed to disclose that: (1) the impact of the error on the Company's financials as of and for the three and six month ended June 30, 2021, or as of and for the three and none months ended September 30, 2021; (2) the disclosures failed to mention that treating this error as a restatement instead of a revision would require the Company to make adjustments to and the reissuance of the amounts reflected in the prior financial statements as compared to making a revision only to the January 15, 2021 financial statements; (3) the disclosures failed to mention that the Company violated the GAAP rules surrounding the accounting of temporary and permanent equity that had been in practice since 2009; and (4) the Company failed to maintain adequate internal controls. As a result, Embark's public statements were materially false and misleading at all relevant times.

130.  The Company failed to correct the misleading statements and omissions in all of the Amendments to the Form S-4.

***October 19, 2021, Definitive Proxy Statement/Prospectus***

131. On October 19, 2021, the Company filed the definitive proxy statement/prospectus on the Form 424B3 with the SEC ("Definitive Proxy Statement"), with regards to the Merger because the SEC concluded that the redeemable common shares in SPACs should all be recorded as temporary equity. Defendant Robertson and Rodrigues signed the Definitive Proxy Statement.

132. The Definitive Proxy Statement and the Amendments to the Form S-4 falsely stated that NGA's condensed statement of changes in stockholders' equity at three and six months ended June 30, 2021 had a total stockholder's equity balance of $5,000,005 as of March 31, 2021. However, this was false because the actual balance was ($37,455,393), which was restated after adjusting the carrying amount of stockholders' equity and reducing it by ($42,455,398).

133. The Definitive Proxy Statement and the Amendments to the Form S-4 falsely stated that NGA's condensed statement of changes in stockholders' equity at three and six months ended June 30, 2021 had a total stockholders' equity of $371,629,911 for the sale of 41,400,000 units, net of underwriting discounts. However, this was false because the actual total stockholders' equity was $0, which was restated after adjusting the carrying value and reducing it by ($371,629,911).

134. The Definitive Proxy Statement and the Amendments to the Form S-4 falsely stated that NGA's condensed statement of changes in stockholders' equity at three and six months ended June 30, 2021 had a total stockholders' equity of ($365,248,633) for the initial value of common stock subject to redemption. However, this was false because the actual value was $0, which was restated after adjusting and adjustment of ($365,248,633).

135. The Definitive Proxy Statement and the Amendments to the Form S-4 falsely stated that NGA's condensed statement of changes in stockholders' equity at three and six months ended June 30, 2021 had a total stockholder's equity of ($6,295,969) for the change in value of common stock subject to redemption during the first quarter of 2021 for the initial value of common stock subject to redemption. However, this was false because the

actual value was $0, which was restated as there was no need for such an adjustment.

136.   The Definitive Proxy Statement and the Amendments to the Form S-4 failed to mention the accretion for common stock to redemption amount as of March 31, 2021 in NGA's Condensed Statement of Changes in Stockholders' Equity at three and six months ended June 30, 2021. However, the Company's accounting errors required the Company to adjust this period, which it did in the restatement and adjusted the amount by ($42,359,126) to the new balance of ($42,359,126).

137.   The Definitive Proxy Statement and the Amendments to the Form S-4 falsely stated that NGA's condensed statement of changes in stockholders' equity at three and six months ended June 30, 2021 had a total stockholder's equity of ($42,455,398) for the change in value of common stock subject to redemption during the second quarter of 2021. However, this was false because the actual value was $0, which was restated as there was no need for such an adjustment.

138.   The Definitive Proxy Statement and the Amendments to the Form S-4 falsely stated that NGA's Condensed Statement of Cash Flows for the six months ended June 30, 2021 had $365,248,633 in initial classification of common stock subject to possible redemption. However, that was false because the actual value was $414,000,000 after it was adjusting the carrying value by $48,751,367.

139.   The Definitive Proxy Statement and the Amendments to the Form S-4 falsely stated that NGA's Condensed Statement of Cash Flows for the six months ended June 30, 2021 had $48,751,367 change in value of common stock subject to redemption. However, this was false because the actual value was $0 after adjusting it for ($48,71,367).

140.   The Definitive Proxy Statement and the Amendments to the Form S-4 falsely stated that "basic and diluted net income per share, Common Stock subject to redemption" as of and for the three and six months ended June 30, 2021 in NGA's Condensed Statements of Operations as ($0.84) and ($0.51), respectively. However, that was false because the Company fixed it in the restatement to ($0.24) and ($0.15), respectively.

141.   The Definitive Proxy Statement and the Amendments to the Form S-4 falsely stated that "basic and diluted weighted average shares outstanding, Common stock subject to redemption" as of and for the three and six months ended June 30, 2021 in NGA's Condensed Statements of Operations as 37,153,752 and 61,945,851, respectively. However, this was false because the actual values were 41,400,000 and 37,969,061, respectively.

142.   The Definitive Proxy Statement and the Amendments to the Form S-4 falsely stated that "basic and diluted net income per share, Non-redeemable common stock" as of and for the three and six months ended June 30, 2021 in NGA's Condensed Statements of Operations as ($0.84) and ($0.51), respectively. However, this was false because the actual restated amounts were ($0.24) and ($0.15), respectively.

143.   The Definitive Proxy Statement and the Amendments to the Form S-4 falsely stated that "basic and diluted weighted average shares outstanding, Non-redeemable common stock" as of and for the three and six months ended June 30, 2021 in NGA's Condensed Statements of Operations as 14,596,248 and 14,393,060, respectively. However, this was false because the actual restated amounts were 10,350,000 and 10,238,122, respectively.

144.   These statements were not only quantitatively false and/or misleading but they failed to disclose that: (1) the impact of the error on the Company's financials as of and for the three and six month ended June 30, 2021, or as of and for the three and none months ended September 30, 2021; (2) the disclosures failed to mention that treating this error as a restatement instead of a revision would require the Company to make adjustments to and the reissuance of the amounts reflected in the prior financial statements as compared to making a revision only to the January 15, 2021 financial statements; (3) the disclosures failed to mention that the Company violated the GAAP rules surrounding the accounting of temporary and permanent equity that had been in practice since 2009; and (4) the

Company failed to maintain adequate internal controls. As a result, Embark's public statements were materially false and misleading at all relevant times.

145.   The Definitive Proxy Statement was also false and misleading for the same reasons mentioned above for the Preliminary Proxy Statement because both of the statements have the same information.

146.   The Company's condensed financial statements as of June 30, 2020 were included in the Definitive Proxy Statement and in the Amendments to the Form S-4, which stated, as follows:

### NORTHERN GENESIS ACQUISITION CORP. II
### CONDENSED BALANCE SHEETS

| | June 30, 2021 | December 31, 2020 |
|---|---|---|
| | (Unaudited) | |
| **ASSETS** | | |
| Current assets | | |
| Cash | $ 296,271 | $ — |
| Prepaid expenses and other current assets | 208,263 | — |
| Total Current Assets | 504,534 | — |
| Deferred offering costs | — | 249,917 |
| Marketable securities held in Trust Account | 414,023,366 | — |
| TOTAL ASSETS | $414,527,900 | $249,917 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities | | |
| Accrued expenses | $ 640,600 | $ 1,450 |
| Accrued offering costs | — | 107,000 |
| Promissory note — related party | — | 117,917 |
| Total Current Liabilities | 640,600 | 226,367 |
| FPA liability | 1,106,667 | — |
| Warrant liability | 34,956,801 | — |
| Deferred underwriting fee payable | 14,490,000 | — |
| **Total Liabilities** | 51,194,068 | 226,367 |
| **Commitments** | | |
| Common stock subject to possible redemption 41,400,000 and -0- shares at redemption value at June 30, 2021 and December 31, 2020, respectively | 414,000,000 | — |
| **Stockholders' Equity** | | |
| Preferred stock, $0.0001 par value; 1,000,000 shares authorized; none issued or outstanding | — | — |
| Common stock, $0.0001 par value; 100,000,000 shares authorized; 15,805,951 and 10,350,000 shares issued and outstanding (excluding 35,944,049 and no shares subject to possible redemption) at June 30, 2021 and December 31, 2020, respectively | 1,035 | 1,035 |
| Additional paid-in capital | — | 23,965 |
| Accumulated deficit | (50,667,203) | (1,450) |
| **Total Stockholders' Equity** | (50,666,168) | 23,550 |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $414,527,900 | $249,917 |

**NORTHERN GENESIS ACQUISITION CORP. II**
**CONDENSED STATEMENTS OF OPERATIONS**
**(UNAUDITED)**

| | Three Months Ended June 30, 2021 | Six Months Ended June 30, 2021 |
|---|---|---|
| Operating and formation costs | $ 1,261,199 | $ 2,873,957 |
| **Loss from operations** | (1,261,199) | (2,873,957) |
| Other expense: | | |
| Change in fair value of warrant liability | (10,857,934) | (4,373,334) |
| Change in fair value of FPA liability | (140,000) | (140,000) |
| Loss on initial issuance of private warrants | — | (267,467) |
| Offering costs allocated to warrant and FPA liabilities | — | (1,148,289) |
| Interest earned on marketable securities held in Trust Account | 15,025 | 23,366 |
| Other expense, net | (10,982,909) | (5,905,724) |
| Loss before income taxes | (12,244,108) | (7,363,925) |
| Benefit (provision) for income taxes | — | — |
| **Net loss** | $(12,244,108) | $ (7,363,925) |
| Basic and diluted weighted average shares outstanding, Common stock subject to redemption | 37,153,752 | 61,945,851 |
| **Basic and diluted net income per share, Common stock subject to redemption** | $ 0.00 | $ 0.00 |
| Basic and diluted weighted average shares outstanding, Non-redeemable common stock | 14,596,248 | 14,393,060 |
| **Basic and diluted net income per share, Non-redeemable common stock** | $ (0.84) | $ (0.51) |

**NORTHERN GENESIS ACQUISITION CORP. II**
**CONDENSED STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY**
**THREE AND SIX MONTHS ENDED JUNE 30, 2021**
**(UNAUDITED)**

| | Common Stock | | Additional Paid-in Capital | Retained Earnings / (Accumulated Deficit) | Total Stockholders' Equity |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| **Balance — January 1, 2021** | 10,350,000 | $ 1,035 | $ 23,965 | $ (1,450) | $ 23,550 |
| Sale of 41,400,000 Units, net of underwriting discounts | 41,400,000 | 4,140 | 371,625,771 | — | 371,629,911 |
| Sale of 6,686,667 Private Placement Warrants | — | — | 10,963 | — | 10,963 |
| Common stock subject to possible redemption | (36,524,863) | (3,652) | (365,244,981) | — | (365,248,633) |
| Change in value of common stock subject to redemption | (628,889) | (63) | (6,295,906) | — | (6,295,969) |
| Net Income | — | — | — | 4,880,183 | 4,880,183 |
| **Balance — March 31, 2021** | 14,596,248 | $ 1,460 | $ 119,812 | $ 4,878,733 | $ 5,000,005 |
| Change in value of common stock subject to redemption | (4,246,248) | (425) | (119,812) | (42,335,161) | (42,455,398) |
| Initial classification of FPA liability | — | — | — | (966,667) | (966,667) |
| Net Loss | — | — | — | (12,244,108) | (12,244,108) |
| **Balance — June 30, 2021** | 10,350,000 | $ 1,035 | $ — | $(50,667,203) | $ (50,666,168) |

Verified Shareholder Derivative Complaint

NORTHERN GENESIS ACQUISITION CORP. II
CONDENSED STATEMENT OF CASH FLOWS
SIX MONTHS ENDED JUNE 30, 2021
(UNAUDITED)

| | |
|---|---:|
| **Cash Flows from Operating Activities:** | |
| Net loss | $ (7,363,925) |
| Adjustments to reconcile net loss to net cash used in operating activities: | |
| Interest earned on marketable securities held in Trust Account | (23,366) |
| Changes in fair value of warrant liability | 4,373,334 |
| Change in fair value of FPA liability | 140,000 |
| Loss on initial issuance of private warrants | 267,467 |
| Offering costs allocable to warrant liabilities | 1,148,289 |
| Changes in operating assets and liabilities: | |
| Prepaid expenses and other current assets | (208,263) |
| Accrued expenses | 639,150 |
| Net cash used in operating activities | (1,027,314) |
| **Cash Flows from Investing Activities:** | |
| Investment of cash in Trust Account | (414,000,000) |
| Net cash used in investing activities | (414,000,000) |
| **Cash Flows from Financing Activities:** | |
| Proceeds from sale of Units, net of underwriting discounts paid | 405,720,000 |
| Proceeds from sale of Private Placement Warrants | 10,030,000 |
| Repayment of promissory note — related party | (117,917) |
| Payment of offering costs | (308,498) |
| Net cash provided by financing activities | 415,323,585 |
| **Net Change in Cash** | 296,271 |
| Cash — Beginning of period | — |
| **Cash — End of period** | $ 296,271 |
| **Non-Cash investing and financing activities:** | |
| Initial classification of common stock subject to possible redemption | $ 365,248,633 |
| Change in value of common stock subject to possible redemption | $ 48,751,367 |
| Initial Classification of Warrant Liabilities | $ 30,583,467 |
| Deferred underwriting fee payable | $ 14,490,000 |

## **The Truth Begins to Emerge**

147.   On November 9, 2021, the Company held a special meeting where the NGA shareholders approved the Merger.

### *November 10, 2021, Form 10-Q*

148.   On November 10, 2021, the Company filed 3Q21. The 3Q21 was signed by Defendant Robertson and Manget, and contained SOX certifications signed by Defendants Robertson and Manget attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the

disclosure of any fraud committed by the Company, its officers, or its directors.

149.    In the 3Q21, the Company disclosed the accounting error related to temporary equity versus permanent equity. Note 2 of the 3Q21 stated:

NOTE  2.  REVISION  OF  PREVIOUSLY  ISSUED  FINANCIAL STATEMENTS

In connection with the preparation of the Company's financial statements as of September 30, 2021, management identified errors made in its historical financial statements where, at the closing of the Company's Initial Public Offering, the Company improperly valued its Common stock subject to possible redemption. The Company previously determined the Common stock subject to possible redemption to be equal to the redemption value of $10.00 per share of Common stock while also taking into consideration a redemption cannot result in net tangible assets being less than $5,000,001. Management determined that the Common stock issued during the Initial Public Offering can be redeemed or become redeemable subject to the occurrence of future events considered outside the Company's control. Therefore, management concluded that the redemption value should include all shares of Common stock subject to possible redemption, resulting in the Common stock subject to possible redemption being equal to their redemption value. As a result, management has noted a reclassification error related to temporary equity and permanent equity. This resulted in an adjustment to the initial carrying value of the Common stock subject to possible redemption with the offset recorded to additional paid-in capital (to the extent available), accumulated deficit and Common stock. However, the reclassification error was significantly major than what the company presented it to be.

150.    It required the Company to disclose a lot more than what they had disclose in the 3Q21 including the impact of the error on the Company's financials as of and for the three and nine months ended June 30, 2021 or on the Company's financials as of for the three and nine months ended September 30, 2021.

151.    Further the disclosure failed to address that the error would require the Company to revise the amounts in its previous financial statements compare to only making a revision to the January 15, 2021 financial statement. The disclosure also failed to address

that the Company violated the GAAP rules for that were present since 2009 and should have been in the Company's knowledge.

152.   The statements referenced in ¶¶ 123-149 were materially false and misleading because there were material errors that required the Company to issue a restatement for such financial statements to be in accordance with GAAP and the Individual Defendants failed to disclose that: (1) the impact of the error on the Company's financials as of and for the three and six month ended June 30, 2021, or as of and for the three and none months ended September 30, 2021; (2) the disclosures failed to mention that treating this error as a restatement instead of a revision would require the Company to make adjustments to and the reissuance of the amounts reflected in the prior financial statements as compared to making a revision only to the January 15, 2021 financial statements; (3) the disclosures failed to mention that the Company violated the GAAP rules surrounding the accounting of temporary and permanent equity that had been in practice since 2009; and (4) the Company failed to maintain adequate internal controls. As a result, Embark's public statements were materially false and misleading at all relevant times

### *November 17, 2021, Form 8-K*

153.   On November 17, 2021, the Company filed the November 2021 8-K. The November 2021 8-K disclosed that Company's "audited balance sheet as of January 15, 2021 and the Company's unaudited financial statements as of March 31, 2021 and for the three months ended March 31, 2021 should no longer be relied upon." The Company stated those statements are unreliable because of the reclassification of all the Company's public shares as temporary equity.

Item 4.02. Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.

On November 12, 2021, the management of Embark Technology, Inc. … became aware that the Chief Accountant's Office of the Securities and Exchange Commission's ("SEC") Division of Corporation Finance had determined that the redeemable common shares should all be recorded as

temporary equity…. The Company had previously classified a portion of the Public Shares in permanent equity because the Company's amended and restated certificate of incorporation provided that the Company will not redeem the Public Shares in an amount that would cause its net tangible assets to be less than $5,000,001. Notwithstanding the provision in the amended and restated certificate of incorporation requiring a minimum net tangible asset amount, based on the re-evaluation discussed above, the Company's management determined that, in accordance with the ASC 480, redemption provisions not solely within the control of the Company would require common stock subject to redemption to be classified outside of permanent equity and therefore all of the Public Shares subject to redemption should be classified outside of permanent equity.

On November 17, 2021, the audit committee of the board of directors of the Company concluded, after discussion with the Company's management, that (i) the Company's audited balance sheet as of January 15, 2021 included as Exhibit 99.1 to the Company's Current Report on Form 8-K filed with the SEC on January 22, 2021 and (ii) the Company's unaudited financial statements as of March 31, 2021 and for the three months ended March 31, 2021 contained in the Company's Quarterly Report on Form 10-Q filed with the SEC on May 26, 2021, should no longer be relied upon due to the reclassification of all of the Company's Public Shares as temporary equity. The tables below present sections of (i) the balance sheets as of January 15, 2021 and March 31, 2021, (ii) the statement of operations for the three months ended March 31, 2021 and (iii) the statement of cash flows for the three months ended March 31, 2021, in each case, as reported, adjusted for the change in accounting treatment and the restated financial statements reflecting those adjustments.

Verified Shareholder Derivative Complaint

**Balance Sheet as of January 15, 2021**

| | As Reported | Adjustments | Restated |
|---|---|---|---|
| Shares Subject to Redemption | $ 365,248,633 | $ 48,751,367 | $ 414,000,000 |
| Class A Common Stock | 1,523 | (488) | 1,035 |
| Additional Paid in Capital | 6,415,718 | (6,415,718) | - |
| (Accumulated Deficit) Retained Earnings | (1,417,236) | (42,335,161) | (43,752,397) |
| Total Stockholders' Equity | 5,000,005 | (48,751,367) | (43,751,362) |
| Number of shares subject to redemption | 36,524,863 | 4,875,137 | 41,400,000 |

2

**Balance Sheet as of March 31, 2021**

| | As Reported | Adjustments | Restated |
|---|---|---|---|
| Shares Subject to Redemption | $ 371,544,602 | $ 42,455,398 | $ 414,000,000 |
| Class A Common Stock | 1,460 | (425) | 1,035 |
| Additional Paid in Capital | 119,812 | (119,812) | - |
| (Accumulated Deficit) Retained Earnings | 4,878,733 | (42,335,161) | (37,456,428) |
| Total Stockholders' Equity | 5,000,005 | (42,455,398) | (37,455,393) |
| Number of shares subject to redemption | 37,153,752 | 4,246,248 | 41,400,000 |

**Statement of Operations for the three months March 31, 2021**

| | As Reported | Adjustments | Restated |
|---|---|---|---|
| Weighted average shares outstanding - redeemable | 36,524,863 | (2,024,863) | 34,500,000 |
| Basic and Diluted EPS - redeemable | $ 0.34 | $ (0.23) | $ 0.11 |
| Weighted average shares outstanding - non-redeemable | 14,187,614 | (4,062,614) | 10,125,000 |
| Basic and Diluted EPS - non-redeemable | $ 0.34 | $ (0.23) | $ 0.11 |

**Statement of Cash Flows for the three months March 31, 2021**

| | As Reported | Adjustments | Restated |
|---|---|---|---|
| Initial classification of common stock subject to redemption | $ 365,248,633 | $ 48,751,367 | $ 414,000,000 |
| Change in value of common stock subject to redemption | 6,295,969 | (6,295,969) | |

The Company reflected the adjustments to the Company's financial statements as of January 15, 2021 in Note 2 of the financial statements included in the Company's Quarterly Report on Form 10-Q for the period ended September 30, 2021, filed with the SEC on November 10, 2021 (the "Q3 10-Q"). ***The Company referred to these adjustments as a 'revision' in the Company's Q3 10-Q, however, these adjustments should have been identified as a 'restatement' of the previously issued audited balance sheet.*** Notwithstanding the misidentification, management believes that the financial statements included in the Q3 10-Q present fairly in all material respects the Company's financial position, results of operations and cash flows for the periods presented.

The Company's management has concluded that at the time the above-mentioned financial statements were issued, in light of the classification error described above, ***a material weakness existed in the Company's internal control over financial reporting with respect to its analysis of complex financial instruments, including the classification of redeemable common stock as temporary equity***. However, the errors relate to the pre- business combination special purpose acquisition company and its financial statements and the Company's management believes that these errors have no material effect on the post-business combination company's financial statements.

154.   After this news came out, Embark's share price fell to $7.17[3] per share on the close of November 18, 2021, which is a fall of $0.72 per share or approximately 9%.

## The Truth Emerges

### November 24, 2021 Form 10-Q

155.   The Company filed an Amended 3Q21 on November 24, 2021. The Amended 3Q21 was signed by Defendant Rodrigues and Hawwa, and contained SOX certifications signed by Defendants Rodrigues and Hawwa attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

156.   In the Amended 3Q21, the Company disclosed that it issued a restatement for its condensed financial statements as of January 15, 2021, as of and for the three months ended March 31, 2021, as of and for the three and six months ended June 30, 2021, and for three and nine months ended September 30, 2021 because it made an accounting error in classifying the redeemable common stock.

The Company is filing this First Amendment on Form 10-Q/A to reflect a restatement of the Company's condensed financial statements as of January 15, 2021, as of and for the three months ended March 31, 2021, as of and for the three and six months ended June 30, 2021 and for the three and nine months ended September 30, 2021 to correct errors in the Company's classification of public shares as permanent equity *as further described* below.

\*\*\*

**Background of Restatement**

*In the Company's previously issued financial statements as of January 15, 2021 and March 31, 2021, a portion of the public shares were classified as permanent equity to maintain stockholders' equity greater than*

---

[3] On August 16, 2022, Embark Technology announced a 1-for-20 reverse stock split. Embark's class A shares started to trade on a split-adjusted basis when the market opened on August 17, 2022. The split adjusted price per share on the close of November 18, 2022, was $143.40, which was approximately $14 per share lower than the previous close.

*$5,000,000 on the basis that the Company could consummate its initial business combination only if the Company has net tangible assets of at least $5,000,001 under the Company's charter. Thus, the Company can only complete a merger and continue to exist as a public company if there are sufficient public shares that do not redeem at the merger and so it was deemed appropriate to classify the portion of its public shares required to keep its stockholders' equity above the $5,000,000 threshold as "shares not subject to redemption."*

However, in light of recent comment letters issued by the Securities & Exchange Commission ("SEC") to several special purpose acquisition companies, management re- evaluated the Company's application of ASC 480-10-99 to its accounting classification of public shares. Upon re-evaluation, management determined that the public shares include certain provisions that require classification of the public shares as temporary equity regardless of the minimum net tangible asset required by the Company to complete its initial business combination.

*The Company's management and the audit committee of the Company's Board of Directors concluded that it is appropriate to restate all of the Company's previously issued financial statements to report all public shares as temporary equity as of January 15, 2021, as of and for the three months ended March 31, 2021, as of and for the three and six months ended June 30, 2021 and for the three and nine months ended September 30, 2021.*

\*\*\*

*Refer to Note 2, Restatement of Previously Issued Financial Statements of this Form 10-Q/A for additional information and for the summary of the accounting impacts of these adjustments to the Company's condensed financial statements* as of and for the three months ended March 31, 2021*, as of and for the three and six months ended June 30, 2021* and for the three and nine months ended September 30, 2021.

The Company previously identified a material weakness in internal controls related to the accounting for warrants issued in connection with our initial public offering. *As a result of the restatement described in this First Amendment on Form 10-Q/A, the Company has concluded there was a material weakness in the Company's internal control over financial reporting at the time the abovementioned financial statements were issued, and its disclosure controls and procedures were not effective at the time the abovementioned financial statements were issued*.

157.   Note 2 to the Condensed Consolidated Financial Statements for September 30, 2021 provided additional information for the Restatement:

NOTE  2.  RESTATEMENT O F  PREVIOUSLY ISSUED FINANCIAL STATEMENTS

In connection with the preparation of the Company's financial statements as of September 30, 2021 in its Original Form 10-Q, the Company concluded it should restate its financial statements to classify all Public Shares in temporary equity. In accordance with ASC 480, paragraph 10-S99, redemption provisions not solely within the control of the Company require common stock subject to possible redemption to be classified outside or permanent equity. The Company previously determined the common stock subject to possible redemption to be equal to the redemption value of $10.00 per share of common stock while also taking into consideration a redemption cannot result in net tangible assets being less than $5,000,001. ***Previously, the Company did not consider redeemable shares classified as temporary equity as part of net tangible assets. Effective with these financial statements, the Company revised this interpretation to include temporary equity in net tangible assets. Accordingly, effective with this filing, the Company presents all redeemable common stock as temporary equity. Additionally, the Company in its Original Form 10-Q referred to these adjustments as a 'revision', however, these adjustments should have been identified as a 'restatement' of the previously issued financial statements.***

As a result, management has noted a reclassification adjustment related to temporary equity and permanent equity. This resulted in an adjustment to the initial carrying value of the common stock subject to possible redemption with the offset recorded to additional paid-in capital (to the extent available), accumulated deficit and common stock.

158.   The impact of the restatement on the Company's financial statements is reflected in the following table:

| Balance Sheet as of January 15, 2021 | As Previously Reported | Adjustment | As Restated |
|---|---|---|---|
| Common stock subject to redemption | $ 365,248,533 | $ 48,751,367 | $ 414,000,000 |
| Common stock shares | 1,523 | (488) | 1,035 |
| Additional paid-in capital | 6,415,718 | (6,415,718) | — |
| Accumulated deficit | (1,417,236) | (42,335,161) | (43,752,397) |
| Total Stockholders' Equity (Deficit) | 5,000,005 | (48,751,367) | (43,751,362) |

| Balance Sheet as of March 31, 2021 | As Previously Reported | Adjustment | As Restated |
|---|---|---|---|
| Common stock subject to possible redemption | $ 371,544,602 | $ 42,455,398 | $ 414,000,000 |
| Common stock shares | 1,460 | (425) | 1,035 |
| Additional paid-in capital | 119,812 | (119,812) | — |
| Retained Earnings (Accumulated deficit) | 4,878,733 | (42,335,161) | (37,456,428) |
| Total Stockholders' Equity (Deficit) | 5,000,005 | (42,455,398) | (37,455,393) |

| Statement of Cash Flows for the Three Months Ended March 31, 2021 | As Previously Reported | Adjustment | As Restated |
|---|---|---|---|
| Initial classification of common stock subject to possible redemption | $ 365,248,633 | $ 48,751,367 | $ 414,000,000 |
| Change in value of common stock subject to possible redemption | 6,295,969 | (6,295,969) | — |

| Statement of Cash Flows for the Six Month Ended June 30, 2021 | | | |
|---|---|---|---|
| Initial classification of common stock subject to possible redemption | $ 365,248,633 | $ 48,751,367 | $ 414,000,000 |
| Change in value of common stock subject to possible redemption | 48,751,367 | (48,751,367) | — |

| Condensed Consolidated Statement of Changes in Stockholders' Equity (Deficit) March 31, 2021 | As Previously Reported | Adjustment | As Restated |
|---|---|---|---|
| Sale of 41,400,000 Units, net of underwriting discounts | $ 371,629,911 | $ (371,629,911) | $ — |
| Initial value of common stock subject to possible redemption at IPO date | (365,248,633) | 365,248,633 | — |
| Change in value of common stock subject to redemption amount | 6,295,969 | (6,295,969) | — |
| Accretion for common stock to redemption amount | | (42,359,126) | (42,359,126) |
| Total stockholders' equity (deficit) | 5,000,005 | (42,455,398) | (37,455,393) |
| Condensed Consolidated Statement of Changes in Stockholders' Equity (Deficit) June 30, 2021 | | | |
| Change in value of common stock subject to redemption | 42,455,398 | (42,455,398) | — |
| Total stockholders' equity | (50,666,168) | | (50,666,168) |

In connection with the change in presentation for common stock subject to redemption, the Company also restated its income (loss) per share. The impact of this restatement on the Company's financial statement is reflected in the following table:

| | Basic and diluted weighted average shares outstanding, Class A common stock subject to possible redemption | Basic and diluted net loss per share, Class A common stock | Basic and diluted weighted average shares outstanding, Class B common stock subject to possible redemption | Basic and diluted net loss per share, Class B common stock |
|---|---|---|---|---|
| **For the three months ended, March 31, 2021** | | | | |
| As Previously Reported | 36,524,863 | $ — | 14,187,614 | $ 0.34 |
| As Restated | 34,500,000 | $ 0.11 | 10,125,000 | $ 0.11 |
| **For the three months ended, June 30, 2021** | | | | |
| As Previously Reported | 37,153,752 | $ — | 14,596,248 | $ (0.84) |
| As Restated | 41,400,000 | $ (0.24) | 10,350,000 | $ (0.24) |
| **For the six months ended, June 30, 2021** | | | | |
| As Previously Reported | 61,945,851 | $ — | 14,393,060 | $ (0.51) |
| As Restated | 37,969,061 | $ (0.15) | 10,238,122 | $ (0.15) |
| **For the three months ended, September 30, 2021** | | | | |
| As Previously Reported | 51,750,000 | $ 0.22 | — | $ — |
| As Restated | 41,400,000 | $ 0.22 | 10,350,000 | $ 0.22 |
| **For the nine month ended, September 30, 2021** | | | | |
| As Previously Reported | 48,906,593 | $ 0.09 | — | $ — |
| As Restated | 39,125,275 | $ 0.08 | 10,275,824 | $ 0.08 |

159.   The Company's condensed financial statements as of and for the three and six month ended June 30, 2021, disclosed should not be relied upon, were included in the Preliminary Proxy Statement/Prospectus. The Company restated the material changes in financial statements as of and for the three and six months ended June 30, 2021.

160.   Moreover, due to the improper accounting, the Company materially misstated its EPS in their financial statements as of and for the three and six months ended June 30, 2021. The Company failed to indicate that there was a revision or restatement required for either of those periods in its 3Q21 and the November 2021 8-K.

161.   It's very important for a SPAC to fully comply with the GAAP rules. Specifically, with regards to the stockholders' equity, proper accounting is necessary because it is an essential element to the merger transaction. Furthermore, investors looks

at an entity's financials and fully rely on the information reported by that entity because they expect the entity to comply with GAAP rules.

162.   After the Amended 3Q21 came out, Embark's shares fell to a close at $8.01 per share on November 24, 2021, which is a fall of $0.51 or approximately 6% from the previous close.

## DAMAGES TO EMBARK

163.   As a direct and proximate result of the Individual Defendants' misconduct, Embark has lost and expended, and will lose and expend, many millions of dollars.

164.   Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and eight of the Individual Defendants.

165.   Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the Overpayment Misconduct.

166.   Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

167.   As a direct and proximate result of the Individual Defendants' conduct, Embark has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

168.   Plaintiff brings this action derivatively and for the benefit of Embark to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Embark, unjust enrichment,

abuse of control, gross mismanagement, waste of corporate assets, violations of the Securities Act, as well as the aiding and abetting thereof, and for contribution under 11(f) of the Securities Act and 21D of the Exchange Act.

169.    Embark is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

170.    Plaintiff is, and has continuously been at all relevant times, a shareholder of Embark. Plaintiff will adequately and fairly represent the interests of Embark in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

171.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

172.    A pre-suit demand on the Board of Embark is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Chao, Grady, Moak, Robertson, and Rodrigues (collectively, the "Director-Defendants"), and non-parties Patricia Chiodo ("Chiodo") and Penelope Herscher (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors who are on the Board at the time this action is commenced.

173.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts and to cause the Company to engage in the Overpayment Misconduct, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

174.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the foregoing schemes to cause the Company

to make false and misleading statements and to engage in the Overpayment Misconduct. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors. Moreover, the Directors caused the Company to fail to maintain internal controls. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

175.   Additional reasons that demand on Defendant Rodrigues is futile follow. Defendant Rodrigues is the CEO of the Company and serves as a Director on the Board as well.  Defendant Rodrigues served as CEO and a director of Legacy Embark prior to the Merger. Thus, as the Company admits, he is a non-independent director. Moreover, he was the CEO of Legacy Embark, and was ultimately responsible for the false and misleading statements and omissions that were made by NGA Defendants during the portion of the Relevant Period prior to the Merger because the Legacy Embark Defendants were aiding and abetting the NGA Defendants' breaches of fiduciary duty. As CEO, the Company provides Defendant Rodrigues with his principal occupation for which he receives handsome compensation. Thus, he cannot disinterestedly consider a demand to sue the directors that control his continued employment, other members of management with whom he worked or still works, and himself. Moreover, Defendant Rodrigues is named as a defendant in the Securities Class Action. As Embark's highest officer, and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. Moreover, as Legacy Embark's highest officer, he aided and abetted the NGA Defendants' breaches of fiduciary duty prior to the Merger, including NGA's engagement in the Overpayment Misconduct. In addition, during the Relevant Period he failed to correct the false and misleading statements. For these reasons, Defendant Rodrigues breached his fiduciary duties to the

Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

176.   Additional reasons that demand on Defendant Robertson is futile follow. Defendant Robertson is a Director at the Company since November 2021. Defendant Robertson served as the CEO and a Board Director of the Company prior to the Merger. In addition to that, he is a member of the Board's Audit and Nominating and Corporate Governance Committees. As one the Directors of the Company pre and post-Merger, Defendant Robertson was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period. Moreover, he was the CEO of NGA, and was ultimately responsible for the false and misleading statements and omissions that were made by NGA during the portion of the Relevant Period prior to the Merger. Defendant Robertson was responsible for the Company's lack of proper disclosures with regards to the accounting errors the Company made. Thus, he cannot disinterestedly consider a demand to sue the directors that control his continued employment, other members of management with whom he worked or still works, and himself. Moreover, Defendant Robertson is named as a defendant in the Securities Class Action. As Embark's trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. Moreover, as NGA's highest officer, he breached his fiduciary duty prior to the Merger, including NGA's engagement in the Overpayment Misconduct. In addition, during the Relevant Period he failed to correct the false and misleading statements. For these reasons, Defendant Robertson breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

177.   Additional reasons that demand on Defendant Chao is futile follow.

Defendant Chao is a Director at the Company since November 2021. She also served as Legacy Embark's Director from June 2021 to November 2021. As a Director of the Company following the Merger and as a director of Legacy Embark, Defendant Chao bears significant culpability for the issuance of false and misleading statements during the Relevant Period. The Company provides Defendant Chao with his principal occupation for which she receives handsome compensation, which was a total award of $2.4 million for 2021 Fiscal Year. Thus, she cannot disinterestedly consider a demand to sue the directors that control her continued employment, other members of management with whom she worked or still works, and herself. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded her duties to protect corporate assets. Moreover, she aided and abetted the NGA Defendants' breaches of fiduciary duty prior to the Merger, including NGA's engagement in the Overpayment Misconduct. In addition, during the Relevant Period she failed to correct the false and misleading statements. For these reasons, Defendant Chao breached her fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

178. Additional reasons that demand on Defendant Grady is futile follow. Defendant Grady is a Director at the Company since November 2021. Defendant Grady served as Legacy Embark's Director from May 2018 until the Merger, and has continued to serve in that role following the Merger. As a Director of the Company following the Merger and as a Director of Legacy Embark, Defendant Grady bears significant culpability for the issuance of false and misleading statements during the Relevant Period. The Company provides Defendant Grady with his principal occupation for which he receives handsome compensation. Thus, he cannot disinterestedly consider a demand to sue the directors that control his continued employment, other members of management with

whom he worked or still works, and himself. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. Moreover, he aided and abetted the NGA Defendants' breaches of fiduciary duty prior to the Merger, including NGA's engagement in the Overpayment Misconduct. In addition, during the Relevant Period he failed to correct the false and misleading statements. For these reasons, Defendant Grady breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

179. Additional reasons that demand on Defendant Moak is futile follow. Defendant Moak co-founded Legacy Embark and served as Legacy Embark's Chief Technology Officer from 2016 until the Merger. He joined the Company's Board upon the consummation of the Merger. Thus, as the Company admits, he is a non-independent director. As a Director of the Company following the Merger and as an officer of Legacy Embark, Defendant Moak bears significant culpability for the issuance of false and misleading statements during the Relevant Period. The Company provides Defendant Moak with his principal occupation for which he receives handsome compensation, which includes a payout of approximately $30.9 million for the 2021 Fiscal Year. Thus, he cannot disinterestedly consider a demand to sue the directors that control his continued employment, other members of management with whom he worked or still works, and himself. For these reasons, Defendant Moak breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

180. Additional reasons that demand on Defendant Chiodo is futile follow. Defendant Chiodo has served as a Company director since November 2021. She serves as Chair of the Audit Committee and as a member of the Compensation Committee. She

receives significant compensation from the Company for his service on the Board. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period she failed to correct the false and misleading statements. For these reasons, Defendant Chiodo breached her fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

181.   Additional reasons that demand on the Board is futile follow.

182.   Additionally, the Director-Defendants have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. Defendants Rodrigues and Moak co-founded Legacy Embark and have worked at the Company together for approximately six years. Thus, any demand on the Director-Defendants would be futile.

183.   Defendants Chiodo (as Chair), Chao, and Robertson (collectively, the "Audit Committee Defendants"), served on the Company's Audit Committee upon the consummation of the merger. The Audit Committee Defendants are responsible for overseeing, among other things, the quality and integrity of the Company's financial statements, the Company's legal and regulatory compliance, the Company's system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls and failed to ensure compliance with laws and regulations as they are charged to do. The Audit Committee Defendants' failure to ensure that adequate internal controls were in place caused the Company to issue false and misleading financial statements to investors. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

184.   In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Directors failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Embark's Code of Conduct. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

185.   Embark has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Director-Defendants or any others who were responsible for that wrongful conduct to attempt to recover for Embark any part of the damages Embark suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

186.   The acts complained of herein constitute violations of fiduciary duties owed by Embark's officers and directors, and these acts are incapable of ratification.

187.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Director-Defendants, and if not all at least a majority of the Directors, face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

188.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Embark to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

189.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

**Against Defendants Robertson, Manget, Dalglish, Jarratt, Schaefer, and Sparkes for Violations of Section 14(a) of the Exchange Act**

190.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

191.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

192.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

193.   Defendants Robertson, Manget, Dalglish, Jarratt, Schaefer, and Sparkes

caused the Definitive Proxy Statement to be false and misleading: (1) by failing to abide by the GAAP rules in classifying the redeemable public shares, (2) by failing to abide by the Code of Ethics; and (3) by getting into an agreement to merge with Legacy Embark without adequate due diligence.

194.   In addition to the reasons below, Defendants Robertson, Manget, Dalglish, Jarratt, Schaefer, and Sparkes caused the Definitive Proxy Statement to be false and misleading by failing to disclose that the Code of Ethics was not abided by as evinced by the accounting errors discussed herein and the fact that the NGA Defendants were engaging in the Overpayment Misconduct, soliciting the Merger with Legacy Embark without having conducted adequate due diligence.

195.   Defendants Robertson, Manget, Dalglish, Jarratt, Schaefer, and Sparkes caused the Definitive Proxy Statement to be materially false and misleading, and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, it contained material errors that required the Company to issue a restatement for such financial statements to be in accordance with GAAP and failed to disclose that: (1) the impact of the error on the Company's financials as of and for the three and six month ended June 30, 2021, or as of and for the three and nine months ended September 30, 2021; (2) the disclosures failed to mention that treating this error as a restatement instead of a revision would require the Company to make adjustments to and the reissuance of the amounts reflected in the prior financial statements as compared to making a revision only to the January 15, 2021 financial statements; (3) the disclosures failed to mention that the Company violated the GAAP rules surrounding the accounting of temporary and permanent equity that had been in practice since 2009; and (4) the Company failed to maintain adequate internal controls. As a result, Embark's public statements were materially false and misleading at all relevant times.

196.   The Company was damaged as a result of Defendants Robertson, Manget, Dalglish, Jarratt, Schaefer, and Sparkes material misrepresentations and omissions in the Definitive Proxy Statement.

197.   Plaintiff on behalf of Wells Fargo has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

198.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

199.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Embark's business and affairs.

200.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

201.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Embark.

202.   In further breach of their fiduciary duties owed to Embark, the Individual Defendants willfully or recklessly made and/or caused the Company to make to the investing public certain statements that were materially false and misleading, including due to material errors that required the Company to issue a restatement for such financial statements to be in accordance with GAAP. The Individual Defendants further failed to disclose that: (1) the impact of the error on the Company's financials as of and for the three and six month ended June 30, 2021, or as of and for the three and none months ended September 30, 2021; (2) the disclosures failed to mention that treating this error as a restatement instead of a revision would require the Company to make adjustments to and the reissuance of the amounts reflected in the prior financial statements as compared to

making a revision only to the January 15, 2021 financial statements; (3) the disclosures failed to mention that the Company violated the GAAP rules surrounding the accounting of temporary and permanent equity that had been in practice since 2009; and (4) the Company failed to maintain adequate internal controls. As a result, Embark's public statements were materially false and misleading at all relevant times

203.   The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

204.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

205.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

206.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

207.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Embark has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

208.   Plaintiff on behalf of Embark has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

209.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

210.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Embark.

211.   The Individual Defendants either benefitted financially from the improper conduct and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Embark that was tied to the performance or artificially inflated valuation of Embark, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

212.   Plaintiff, as a shareholder and representative of Embark, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits— benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

213.   Plaintiff on behalf of Embark has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Abuse of Control

214.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

215.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Embark, for which they are legally responsible.

216.   As a direct and proximate result of the Individual Defendants' abuse of control, Embark has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

217.   Plaintiff on behalf of Embark has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

218.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

219.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Embark in a manner consistent with the operations of a publicly-held corporation.

220.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Embark has sustained and will continue to sustain significant damages.

221.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

222.   Plaintiff on behalf of Embark has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

223.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

224.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

225.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

226.   Plaintiff on behalf of Embark has no adequate remedy at law.

Verified Shareholder Derivative Complaint

## SEVENTH CLAIM

## Against Defendants Robertson, Manget, Jarratt, Dalglish, Schaefer, Sparkes, Rodrigues, and Hawwa for Contribution Under Sections 11(f) of the Securities Act and 21D of the Exchange Act

227.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

228.   Embark, along with Defendants Robertson, Manget, Jarratt, Dalglish, Schaefer, Sparkes, Rodrigues, and Hawwa are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Section 11 of the Securities Act, among other claims. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Robertson, Manget, Jarratt, Dalglish, Schaefer, Sparkes, Rodrigues, and Hawwa willful and/or reckless violations of their obligations as officers and/or director of Embark.

229.   Defendants Robertson, Manget, Jarratt, Dalglish, Schaefer, Sparkes, Rodrigues, and Hawwa, because of their positions of control and authority as officers and/or director of Embark, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Embark, including the wrongful acts complained of herein and in the Securities Class Action.

230.   Accordingly, Defendants Robertson, Manget, Jarratt, Dalglish, Schaefer, Sparkes, Rodrigues, and Hawwa are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

231.   As such, Embark is entitled to receive all appropriate contribution or indemnification from Defendants Robertson, Manget, Jarratt, Dalglish, Schaefer, Sparkes, Rodrigues, and Hawwa.

## EIGHTH CLAIM

### Against the Legacy Embark Defendants for Aiding and Abetting

### Breach of Fiduciary Duty

232.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

233.   The Legacy Embark Defendants aided and abetted the NGA Defendants who breached their fiduciary duties to the Company.

234.   The Legacy Embark Defendants' misconduct resulted in continuous, connected, and ongoing harm to the Company as a result of the Overpayment Misconduct.

235.   The Legacy Embark Defendants are jointly and severally liable to the same extent as the NGA Defendants are liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

236.   As a direct and proximate result of the Legacy Embark Defendants' aiding and abetting of the NGA Defendants' breaches of duty alleged herein, the Company has sustained and will continue to sustain substantial damages.

237.   Plaintiff on behalf of Embark has no adequate remedy at law

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Embark, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Embark;

(c)   Determining and awarding to Embark the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Embark and the Individual Defendants to take all necessary

actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Embark and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

> 1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

> 2. a provision to permit the shareholders of Embark to nominate at least three candidates for election to the Board; and

> 3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Embark restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **<u>JURY TRIAL DEMANDED</u>**

Plaintiff hereby demands a trial by jury.

Dated: September 23, 2022          Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**
*/s/*Robert C. Moest
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897

Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

# VERIFICATION

I,     Josh Luberisse        am      a        plaintiff in      the  within         action.
I  have   reviewed   the   allegations   made   in     this     shareholder   derivative
complaint,  know   the  contents   thereof,   and   authorize   its    filing.   To   those
allegations   of which   I have  personal   knowledge,   I  believe  those  allegations   to
be   true.   As to   those  allegations   of which   I  do   not  have  personal  knowledge,  I
rely  upon  my counsel and their investigation and believe them to be true.

I declare under penalty                    foregoing is true and correct.  Executed this _th
day of _____, 2022.

9/23/2022

*Joshua Luberisse*

85E4BC8BD0B2403...